**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Maria VEGA–BARVO,**
**Defendant-Appellant.**

No. 82–5957.

United States Court of Appeals,
Eleventh Circuit.

April 16, 1984.

Kenneth E. Cohen, Charles G. White, Asst. Federal Public Defenders, Miami, Fla., for defendant-appellant.

Stanley Marcus, U.S. Atty., Michael W. Burnbaum, Linda Collins Hertz, James G. McAdams, III, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before RONEY, HATCHETT and ANDERSON, Circuit Judges.

RONEY, Circuit Judge:

This case and other cases decided this day raise the question as to what standard should be applied in deciding the Fourth Amendment constitutionality of x-ray searches of the stomach, manual body cavity probes, and detention to determine if persons entering the United States are carrying contraband narcotics in their bodies.[1] During a border search, an x-ray revealed that defendant Maria Victoria Vega-Barvo had swallowed 135 cocaine-filled condoms. The sole issue on this appeal from her convictions of importation and possession with intent to distribute, 21 U.S.C.A. §§ 952(a) and 841(a)(1), is whether the discovery that her body contained contraband was the result of an unconstitutional search. Holding that an x-ray is no more intrusive than a strip search, and that the facts in this case created a level of suspicion sufficient to justify a strip search under the reasonable suspicion test set forth in our decided cases, we affirm.

*The Search*

Shortly after she arrived at Miami International Airport from Bogota, Colombia, Vega-Barvo was noticed by a customs inspector. His suspicions were initially aroused because she was a South American woman traveling alone and although she was conservatively dressed, she was carrying only one piece of poor-quality luggage. Based on these observations, the inspector detained Vega-Barvo at a secondary inspection area for questioning. Upon inquiry into the reason for her trip, Vega-Barvo explained that she was a tourism promoter and she had come to Miami with the intention of putting together tours to the area. She added that she owned a travel agency. Vega-Barvo's credibility was damaged, however, by her responses to more specific questions and an examination of her passport, customs declaration, and airline ticket. The inspector noted a number of inconsistencies with her claim to be a businesswoman. First, her poor handwriting on the customs declaration evidenced a lack of education and her passport showed no other trips. Second, her ticket had not been obtained through her travel agency but had been purchased for cash from a travel agency she had never heard of and she did not know the price or the date of purchase of the ticket. Third, she had no business cards, little or no cash, and no credit cards or checks. Finally, she could name no hotels or persons in Miami she planned to contact in arranging her tours. Throughout the questioning Vega-Barvo exhibited signs of extreme nervousness, such as handwringing and a rapidly pulsating carotid artery.

On the basis of these circumstances, Vega-Barvo was taken to a search room where she was patted down by a female agent with negative results. Meanwhile, the inspector searched Vega-Barvo's one bag and discovered it "contained mainly rags." He also attempted unsuccessfully to verify her claim to have reservations at the Hotel Presidente. When Vega-Barvo returned, she was asked how she planned to get to her hotel. She responded she would take a cab but was unable to explain how she would pay for the ride when it was pointed out that she had no money.

At this point the customs inspector concluded Vega-Barvo was carrying drugs internally and read the *Miranda* rights to her. A Drug Enforcement Agent then intervened and repeated the *Miranda* rights, obtaining a waiver from her. He reques-

1. No. 82–6037 *United States of America v. Padilla,* 729 F.2d 1367.

No. 82–5941 *United States of America v. Pino,* 729 F.2d 1357.

No. 82–6056 *United States of America v. Henao-Castano,* 729 F.2d 1364.

No. 83–5006 *United States of America v. Mosquera-Ramirez,* 729 F.2d 1352.

No. 83–5064 *United States of America v. Castaneda-Castaneda,* 729 F.2d 1360.

No. 83–5278 *United States of America v. De Montoya,* 729 F.2d 1369.

tioned her concerning the purpose of her trip and received the same inconclusive answers. After obtaining a second waiver of her rights, the DEA Agent asked Vega-Barvo if she was carrying drugs internally. When she denied that she was, the agent asked if she would consent to an abdominal x-ray. She did.

Vega-Barvo was transported to a local hospital where she signed the necessary consent forms and was x-rayed. The x-ray revealed foreign objects in her stomach. When advised of this she confessed to swallowing 135 cocaine-filled condoms. These condoms were eventually retrieved from her fecal matter. They did indeed contain cocaine.

Prior to trial, Vega-Barvo moved to suppress the cocaine on the grounds that the x-ray search violated her Fourth Amendment rights. The trial court denied the motion finding that Vega-Barvo consented to the search. Vega-Barvo renews her Fourth Amendment challenge in this Court arguing that her consent was not voluntary and that the search was unreasonable. Because we hold this was a reasonable border search, we need not address the consent issue. Whether the consent was valid or not, this was not a physically forced procedure.

### The Standards

■ Border searches have a unique status in constitutional law. The Supreme Court has consistently held that border searches are not subject to the probable cause and warrant requirements of the Fourth Amendment. *United States v. Ramsey*, 431 U.S. 606, 619, 97 S.Ct. 1972, 1980, 52 L.Ed.2d 617 (1977). Congress has given customs inspectors virtually unlimited authority to search and detain persons entering the United States from a foreign country. 19 U.S.C.A. § 1582. Although this authority is limited by the reasonableness requirement of the Fourth Amendment, *United States v. Villamonte-Marquez*, — U.S. —, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983), the Supreme Court has never decided what standard of reasonable-

ness should be applied to body searches. In *Ramsey*, the Court explicitly reserved the question of "whether, and under what circumstances, a border search might be deemed 'unreasonable' because of the particularly offensive manner in which it is carried out." 431 U.S. at 618, n. 13, 97 S.Ct. at 1979 n. 13.

■ This Court has applied this reasonableness requirement by adopting a flexible test which adjusts the strength of suspicion required for a particular search to the intrusiveness of that search. As intrusiveness increases, the amount of suspicion necessary to justify the search correspondingly increases. This approach attempts to balance the privacy interests of the international traveler and the Government's interest in controlling the flow of contraband. *See United States v. Sandler*, 644 F.2d 1163, 1165 (5th Cir.1981) (en banc); *United States v. Afanador*, 567 F.2d 1325, 1328 (5th Cir.1978); *United States v. Himmelwright*, 551 F.2d 991, 994, (5th Cir.), *cert. denied*, 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977). The Supreme Court has used a similarly flexible approach to near-the-border vehicular searches for illegal aliens, balancing governmental interests against the intrusiveness of the search to determine the amount of suspicion required to justify the search. *Compare United States v. Brignoni-Ponce*, 422 U.S. 873, 883, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975) (reasonable suspicion required for random stops) *with United States v. Martinez-Fuerte*, 428 U.S. 543, 562, 96 S.Ct. 3074, 3085, 49 L.Ed.2d 1116 (1976) (no individualized suspicion needed for checkpoint stops). There is no reason to believe that this same flexible approach would not apply to body searches. *See Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979).

Fifth Circuit cases prior to October 1, 1981, *see Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981), together with Eleventh Circuit cases, establish a hierarchy of intrusiveness of searches. Although "[e]ach case must turn on the totality of the particular circumstances," *Unit-*

ed States v. Brignoni-Ponce, 422 U.S. at 885 n. 10, 95 S.Ct. at 2582 n. 10, some general categorizations can be made.

■■■ No articulable suspicion is required for routine border searches which only intrude slightly on a person's privacy. Himmelwright, 551 F.2d at 994. Both a luggage search and a pat-down or frisk fall within this category and these searches can be legitimately carried out on no more than a generalized "mere suspicion" or "subjective response" of the customs inspector. A person's decision to cross our national boundary is justification enough for such a search. Sandler, 644 F.2d at 1167, 1169. A more intrusive search, the strip search, requires a particularized "reasonable suspicion." Himmelwright, 551 F.2d at 995. This standard has been held to have been met if a person behaves in an articulably suspicious manner. E.g., United States v. Carter, 590 F.2d 138 (5th Cir.), cert. denied, 441 U.S. 908, 99 S.Ct. 2001, 60 L.Ed.2d 378 (1979) (suspect fit drug courier profile, was overly helpful in search of luggage, acted extremely nervous, and wore bulky clothing); United States v. Olcott, 568 F.2d 1173 (5th Cir.1978) (suspect fit drug courier profile, was unable to produce business effects though purportedly on business trip, and wore bulky clothing); United States v. Himmelwright, 551 F.2d 991 (5th Cir.), cert. denied, 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977) (suspect fit drug courier profile and gave evasive and contradictory answers).

The arguably greater intrusion involved in internal body searches has never been addressed by this Court in circumstances similar to the cases that were argued together and which are decided today. Several earlier cases approving such searches at the border involved the greater quantum of suspicion provided by an informant's tip. United States v. Briones, 423 F.2d 742 (5th Cir.), cert. denied, 399 U.S. 933, 90 S.Ct. 2270, 26 L.Ed.2d 804 (1970) (stomach search by means of emetic); King v. United States, 258 F.2d 754 (5th Cir.1958) (stomach search by means of emetic after fluoroscope showed foreign objects); see

Barrera v. United States, 276 F.2d 654 (5th Cir.1960) (stomach search by use of emetic permissible when suspect seen swallowing drugs). In Briones, the most recent of these cases, the court explicitly declined to specify what standard was applicable to a stomach search, merely noting that under whatever standard was employed the use of the emetic here was reasonable. 423 F.2d at 744.

■■ To determine the "intrusiveness" level of the internal body searches involved in today's cases, it is necessary to decide whether intrusiveness is to be defined in terms of whether one search will reveal more than another, or whether intrusiveness is to be interpreted in terms of the indignity that will be suffered by the person being searched. For example, is an x-ray more intrusive than a cavity search because it will reveal more than the cavity search, or less intrusive because it does not infringe upon human dignity to the same extent as a search of private parts? A person can retain some degree of dignity during an x-ray, but it is virtually impossible during a rectal probe, despite the more limited scope of such a search. Another consideration in measuring the intrusiveness of a search is risk of injury. This factor must be considered independently of the indignity or extensiveness of the search.

■■ Although not conclusively decided in this Circuit, the precedents clearly indicate that to determine the level of intrusiveness of a search, we must focus on the indignity of the search, and that extensiveness alone does not control. As the Supreme Court stated in Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), "[t]he overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the state." Id. at 767, 86 S.Ct. at 1834. A similar concern was voiced in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), where the Court approved the police's use of stop-and-frisk searches for weapons based on reasonable suspicion. In deciding whether a

stop-and-frisk was a search the Court opined:

> [I]t is simply fantastic to urge that such a procedure performed in public by a policeman while the citizen stands helpless, perhaps facing a wall with his hands raised, is a "petty indignity". It is a serious intrusion upon the sanctity of a person, which may inflict great indignity and arouse strong resentment. . . .

*Id.* at 16–17, 88 S.Ct. at 1877. In the illegal alien search cases, the primary factor the Court used in determining the intrusiveness of the various search techniques of the border patrol was the fright engendered by the particular search.

> [T]he circumstances surrounding a checkpoint stop and search are far less intrusive than those attending a roving-patrol stop. Roving-patrols often operate at night on seldom-traveled roads, and their approach may frighten motorists. At traffic checkpoints the motorist can see that the other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion.

*United States v. Ortiz,* 422 U.S. 891, 894–95, 95 S.Ct. 2585, 2587–88, 45 L.Ed.2d 623 (1975). In a similar case, the Court upheld use of a checkpoint since "the stops should not be frightening or offensive because of their public and relatively routine nature." *United States v. Martinez-Fuerte,* 428 U.S. 543, 560, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976).

This Court, also, in applying the Fourth Amendment to border searches has been guided by its perception of the indignity of government actions. We noted in *United States v. Sandler,* 644 F.2d 1163, 1167 (5th Cir.1981) (en banc), that the "key variable" in determining the reasonableness of a pat-down search at the border was "the invasion of privacy and dignity of the individual." Crucial to this Court's analysis was its conclusion that a pat-down "involves relatively little indignity or embarrassment", as compared to a strip search. *Id.* The Court thought that little or no stigma

attached to a pat-down in a border-crossing situation.

This indignity analysis pervades the border search cases throughout the other circuits. *See, e.g., United States v. Nieves,* 609 F.2d 642, 646 (2d Cir.1979), *cert. denied,* 444 U.S. 1085, 100 S.Ct. 1044, 62 L.Ed.2d 771 (1980); *United States v. Wardlaw,* 576 F.2d 932, 934 (1st Cir.1978); *United States v. Brown,* 499 F.2d 829, 833 (7th Cir.), *cert. denied,* 419 U.S. 1047, 95 S.Ct. 619, 42 L.Ed.2d 640 (1974). The "new" Fifth Circuit has explicitly held that "intrusion is keyed to embarrassment, indignity, and invasion of privacy." *United States v. Mejia,* 720 F.2d 1378, 1382 (5th Cir.1983). This case is of special significance because it involved an x-ray search done at the border and the defendant argued that intrusiveness should be determined by the extent of physical invasion.

 We hold therefore that personal indignity suffered by the individual searched controls the level of suspicion required to make the search reasonable. The question then is how an x-ray search plays out against this standard. After examining a wide variety of Fourth Amendment cases, we have isolated three factors which contribute to the personal indignity endured by the person searched: (1) physical contact between the searcher and the person searched; (2) exposure of intimate body parts; and (3) use of force. These factors tend to control the level of insult to personal privacy visited upon the victim of a search.

The physical contact factor has been noted in both body and personal effects searches at airports. Boarding passengers are commonly required to walk through a magnetometer and their luggage is passed through a magnetometer or an x-ray machine. This screening procedure although deemed a Fourth Amendment search has been regarded by courts as less intrusive than an officer performing a pat-down or personally examining the contents of the passenger's luggage. *United States v. Henry,* 615 F.2d 1223, 1227–28 (9th Cir. 1980); *United States v. Epperson,* 454

F.2d 769, 770 (4th Cir.), *cert. denied,* 406 U.S. 947, 92 S.Ct. 2050, 32 L.Ed.2d 334 (1972); W. Lafave, *Search & Seizure, A Treatise on the Fourth Amendment,* § 10.6(e) at 353–54 (1978). The use of narcotic-detecting dogs to search luggage has been held by the Supreme Court not to even qualify as a search for Fourth Amendment purposes on similar grounds. *United States v. Place,* —— U.S. ——, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). The Court reasoned that subjecting luggage to a "canine sniff" was much less intrusive than allowing an officer to rummage through the contents of the suitcases. *Accord Horton v. Goose Creek Independent School District,* 690 F.2d 470, 479 (5th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 3536, 77 L.Ed.2d 1387 (1983) (although "canine sniff" is a search when dog physically touches person it might not be a search if it could be performed from a distance).

The embarrassment caused by the exposure of intimate body parts is often a determinative factor in the constitutionality of border searches. Distinctions have been drawn between total strip searches and strip searches which only require exposure of parts of the body commonly displayed in public. *E.g., United States v. Rice,* 635 F.2d 409 (5th Cir. Unit B 1981) (lifting pants to allow visual inspection of a female's lower leg not a strip search because female leg is ordinarily exposed); *United States v. Nieves,* 609 F.2d 642 (2d Cir.1979) (removal of shoes not as embarrassing as strip search). As drug smugglers have become more ingenious, courts have also had to distinguish between different body orifices according to the indignity caused by peering into them. *Himmelwright,* 551 F.2d at 995 n. 11 (vaginal or rectal cavity is more private than oral cavity); *United States v. Holtz,* 479 F.2d 89 (9th Cir.1973) (differentiating between a visual search of the rectum and vaginal cavity). One case of particular relevance to the present problem is *United States v. Sanders,* 663 F.2d 1 (2d Cir.1981). In that case, an individual was apprehended trying to smuggle drugs into the country in an artificial leg. He attempted to exclude the seized contraband from his trial arguing that a search of an artificial leg was analogous to the search of a body cavity and that the higher level of suspicion necessary for the latter search was not present. Although technically correct on extensiveness grounds, the court rejected this argument observing that removal of a leg "constitutes an embarrassment. But done in a medical setting, unaccompanied by exposure of intimate body parts, and without physical force, the search here was no more intrusive than the strip search in *Ashbury,* and clearly less intrusive than a body cavity search." *Id.* at 3 (footnotes omitted); *see United States v. Carter,* 563 F.2d 1360 (9th Cir.1977) (also rejecting argument that an artificial leg is a body cavity).

■ Finally, considerable indignity results when a person is physically forced to submit to a search. This issue received the Supreme Court's attention in *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), where police searched Rochin's stomach by directing a physician to force a tube down Rochin's throat so an emetic could be administered. Although the police had witnessed Rochin swallowing what they believed to be a controlled substance, the Court held that their behavior violated the Fourteenth Amendment's due process clause because it "shocked the conscience". The scope of *Rochin* has been limited by the Court's later decision in *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). In that case, the Court held that the taking of blood against a person's will for determining blood-alcohol content did not violate the Fourth Amendment. The Court emphasized that blood tests are a commonplace procedure, that they involve "virtually no risk, trauma, or pain," and that in this case the blood was taken by a physician at a hospital. *Id.* at 770–71, 86 S.Ct. at 1835–36. After *Rochin* and *Schmerber,* the constitutionality of nonconsensual bodily searches has proved a troublesome question for courts. *Compare United States v. Cameron,* 538 F.2d 254 (9th Cir.1976) (forced enema was unreasonable search)

*with Rivas v. United States,* 368 F.2d 703 (9th Cir.1966), *cert. denied,* 386 U.S. 945, 87 S.Ct. 980, 17 L.Ed.2d 875 (1967) (forced rectal probe was reasonable search) *and Lee v. Winston,* 717 F.2d 888 (4th Cir.1983) (forced surgical procedure to remove bullet in chest violates Fourth Amendment); *with United States v. Crowder,* 543 F.2d 312 (D.C.Cir.1976) (en banc), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 788, 50 L.Ed.2d 779 (1977) (forced surgical procedure to remove bullet in forearm does not violate Fourth Amendment). Nevertheless, force, or the lack thereof, remains a factor to be considered in Fourth Amendment cases. *See e.g., Yanez v. Romero,* 619 F.2d 851, 855 (10th Cir.), *cert. denied,* 449 U.S. 876, 101 S.Ct. 221, 66 L.Ed.2d 98 (1980) (when use of catheter only threatened and not actually forced on person, no Fourth Amendment violation). The general procedures of the customs officials in the Miami area, from which the cases decided today come, do not include the physical force with which the courts were concerned in the above cases. These cases also present no specific instances of force except perhaps the shackling to a wheelchair for detention purposes of Rodrigo Henao-Castano. *United States v. Henao-Castano,* 729 F.2d 1364, (11th Cir.1984).

In evaluating the indignity of x-ray searches in view of these three factors, we first note some general characteristics of x-rays. X-rays do not require physical contact, they do not expose intimate body parts, and hospitals generally will not perform an x-ray procedure without a person's consent. Additionally, although not falling clearly under any of the three factors, an x-ray is one of the more dignified ways of searching the intestinal cavity. *See Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (in a *Terry*-type detention, least intrusive investigative methods should be used). To induce vomiting by use of an emetic is much more degrading. Our analysis thus points toward regarding x-rays as a relatively unintrusive search. Nothing in the way the x-ray was conducted in this case changes this conclusion.

Vega-Barvo argues, however, that despite the x-ray's inoffensive nature, its medical dangers control the intrusiveness issue. It must be conceded without need for analysis that as medical danger increases because of a search procedure, so must the reasons for conducting the procedure. *See Sandler,* 644 F.2d at 1167. Although no documented evidence on the harmful effects of x-rays was placed in the record, one of the consequences of a misused x-ray occurred in this case. Several weeks after she was x-rayed, Vega-Barvo discovered she was pregnant. Not knowing this fact at the time of the x-ray, she had answered no to the doctor's inquiry on this matter. Since the question was asked, it must be assumed the x-ray would not have been conducted if the doctors knew she was pregnant. When she readvised the same doctors of her condition, they suggested she abort the fetus because it may have been damaged by the x-rays. She followed the doctor's advice.

Despite these unfortunate circumstances, there is insufficient record evidence of the normal medical dangers of x-rays to support a conclusion that an x-ray search is more intrusive than a strip search. The Miami customs inspectors follow the procedure of taking a suspect to a hospital where a physician conducts the x-ray examination. Without a more generalized showing that routine abdominal x-rays pose a significant health risk, it would be inappropriate to impose stringent Fourth Amendment constraints on their use in border searches.

The Ninth Circuit has reached the opposite conclusion on x-rays. In *United States v. Ek,* 676 F.2d 379, 382 (9th Cir. 1982), the court held that the medical dangers of x-rays made them more intrusive than a strip search. This result has been accepted grudgingly in the Ninth Circuit. *United States v. Shreve,* 697 F.2d 873, 874 (9th Cir.1983); *see United States v. Erwin,* 625 F.2d 838, 841 (9th Cir.1980) (x-ray is less intrusive than a normal examination).

We do not follow the *Ek* court's decision. At the same time, we recognize that if not performed properly, an x-ray can be dangerous. Taking this factor and the delay and inconvenience involved in x-ray searches into consideration, we hold that an x-ray while more intrusive than a frisk, is no more intrusive than a strip search. This is even more true where, as here, the x-ray is consented to. *See United States v. Pino*, 729 F.2d 1357 (11th Cir.1984).

■ Customs inspectors need not seek a search warrant to perform either an x-ray or any other type of border search. While it appears that this has become standard operating procedure in the Ninth Circuit for internal body searches, *see United States v. Ek*, 676 F.2d 379, 382 (9th Cir. 1982), we cannot understand by what authority a magistrate can constitutionally issue a search warrant on less than probable cause. *See* U.S. Const. amend. IV; *Ek*, 676 F.2d at 383 (Schnacke, J., concurring)

*The Decision*

■ Having concluded that the customs inspectors x-ray procedures were no more intrusive than a strip search, the facts must now be evaluated in light of the level of suspicion required by the reasonable suspicion test in the context of a strip search. Reasonable suspicion to justify a strip search can only be met by a showing of articulable facts which are particularized as to the person and as to the place to be searched. *Himmelwright*, 551 F.2d at 995; *see United States v. Cortez*, 449 U.S. 411, 417–19, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981). The burden of proof for this showing is on the Government. *United States v. Newell*, 506 F.2d 401, 404 (5th Cir.1975); *United States v. Diemler*, 498 F.2d 1070, 1072 (5th Cir.1974).

This Court has decided several border strip search cases involving the smuggling of drugs. Where the search has been upheld, the defendant has dressed in a suspicious manner, and either was evasive in answering questions or excessively nervous. *See, e.g., United States v. Walters*, 591 F.2d 1195 (5th Cir.), *cert. denied*, 442 U.S. 945, 99 S.Ct. 2892, 61 L.Ed.2d 317 (1979); *United States v. Forbicetti*, 484 F.2d 645 (5th Cir.1973), *cert. denied*, 416 U.S. 993, 94 S.Ct. 2404, 40 L.Ed.2d 772 (1974). In most of these cases, the suspect was initially approached because he fit a drug courier profile. It is not the profile, however, but the factors which make up the profile which are crucial to whether or not there is a reasonable suspicion. *See United States v. Berry*, 670 F.2d 583, 600 (5th Cir. Unit B 1982) (en banc). If the profile is overly general, it carries little weight in this determination. In *United States v. Himmelwright*, the defendant fit the drug courier profile because "she was a woman, traveling alone, wearing platform shoes, and recently returning from a short stay in Columbia." 551 F.2d at 996. Of much greater significance was the fact that she gave evasive and contradictory answers to questions about her employment. The court held that a strip search based on these factors, was permissible under the Fourth Amendment. *Id.*

The only case in this Circuit or the former Fifth Circuit in which the contraband was excluded because of an unreasonable search was *United States v. Afanador*, 567 F.2d 1325 (5th Cir.1978). The defendant, a flight attendant, was strip-searched because the customs inspectors had received a tip that one of her fellow crew members was smuggling cocaine. Cocaine was discovered in her girdle. The Government argued that the search was justified because the flight attendant fit a drug courier profile. Although doubting that she fit the profile, the court held that even if she did, that factor alone would not validate the search. Noting that no suspicious information was discovered during the questioning of the flight attendant, the court found that the search was unreasonable. *Id.* at 1330.

The instant facts do not mesh neatly with any of the previous cases because different modes of smuggling are involved. *Himmelwright* and other similar cases involved Americans on drug-buying excur-

sions. The usual method of concealing the contraband was taping it to some part of the body or stuffing it in underclothes. The instant case involves a new trend in drug smuggling. The drug runner is a non-American hired as a "mule" to carry cocaine in his or her digestive tract into this country. These smugglers are commonly referred to as "swallowers." Since swallowers follow a different mode of operation, customs agents' suspicions will be aroused by different factors. For example, suspicion will not focus on bulky dress, *see, e.g. Olcott,* 568 F.2d at 1174, but on the traveler's inability to explain his or her trip.

■ Many of the factors supporting reasonable suspicion will seem innocent enough if evaluated independently and without the expertise of an experienced customs inspector. Yet, the Supreme Court has recognized that "when used by trained law enforcement officers, objective facts, meaningless to the untrained, can be combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular person ..." *United States v. Cortez,* 449 U.S. at 419, 101 S.Ct. at 695–96. This does not mean that a customs inspector's judgment is insulated from judicial review. The standard, however, must be whether under the "totality of the circumstances" an experienced customs inspector would reasonably believe the traveler was carrying contraband.

■ In this case, a number of factors, when combined, support a finding of reasonable suspicion. The customs inspector's initial observation of Vega-Barvo and search of her personal effects revealed that: she was a South American traveling alone; she arrived from a drug-source country; she was carrying a single piece of poor quality luggage which "contained mostly rags"; she had no credit cards or checks; and she showed signs of extreme nervousness. During questioning, Vega-Barvo claimed to own a travel agency and be in Miami to put together a tour. This story was not credible in light of the facts already discovered. We conclude that the customs inspectors' suspicion that Vega-Barvo was carrying cocaine internally was reasonable under the law, and that this suspicion rendered the non-forced x-ray, performed by a physician in a hospital, reasonable. *See United States v. Clymore,* 515 F.Supp. 1361 (E.D.N.Y.1981) (upholding a strip search on similar facts).

We recognize that this holding conflicts with *United States v. Quintero-Castro,* 705 F.2d 1099 (9th Cir.1983), where the Ninth Circuit on similar facts excluded cocaine discovered by an x-ray search. It is consistent with the recent Fifth Circuit case of *United States v. Mejia,* 720 F.2d 1378 (5th Cir.1983). The difference in result comes from the difference in analysis of the intrusiveness of an x-ray search.

AFFIRMED.

HATCHETT, Circuit Judge, dissenting:

The court today decides seven cases regarding persons detained and searched at our border and found to be internal carriers of contraband.[1] I dissent in this case because it presents what will probably become a typical fact pattern and contains all of the issues to be faced in these cases. In

---

**1.** I dissent for the reasons expressed herein in *United States v. Henao-Castano; United States v. Padilla; United States v. Mosquera-Ramirez;* and *United States v. Castaneda-Castaneda.*

I concur in upholding the searches in *United States v. DeMontoya* and *United States v. Pino,* because the searches were based on valid consents.

In *Castaneda-Castaneda,* I dissent for the reasons herein expressed and because customs official's trickery did not result in merely a confession, but a consent to search. While the majority has correctly cited the confession by trick

cases, it has not cited any case which indicates that consent to search may be lawfully produced by trickery. Case law dictates that consent to search must be voluntarily given. One can hardly act voluntarily without knowing the true facts. *United States v. Smith,* 543 F.2d 1141, 1145 (5th Cir.1976), *cert. denied,* 429 U.S. 1110, 97 S.Ct. 1147, 51 L.Ed.2d 564 (1977); *Alexander v. United States,* 390 F.2d 101 (5th Cir.1968).

The shackling of the appellant to a wheelchair in *Henao-Castano* is not only highly intrusive, but constitutes arrest and imprisonment.

this case, we have no particularized suspicion but a matching with a drug profile, detention, consent, and the x-ray search.

At the outset, it is important to keep in mind that these cases do not concern immigration matters, or the right of a person to enter or remain in the country. These are customs cases and involve what things may be brought into the country and under what circumstances. Therefore, the rule fashioned today applies not only to poor and illiterate foreigners, but also applies to everyone crossing the border, including United States citizens returning to this country.

The constitutional issue posed in these cases is not an easy one, and it is a matter of first impression in this circuit. The resolution of the issue requires a balancing between the effort to ferret out criminal activity on the one hand and the necessity to protect rights guaranteed by the fourth amendment to the Constitution of the United States.

On two matters I am certain: First, the degree of suspicion necessary for an x-ray search at the border should not be probable cause. Second, the majority has correctly rejected the Ninth Circuit's requirement that x-ray searches be conducted only after a magistrate issues an order based upon an affidavit showing that there is a "clear indication" or "plain suggestion" that the person is carrying contraband within the body. *United States v. Quintero-Castro,* 705 F.2d 1099 (9th Cir.1983); *United States v. Aman,* 624 F.2d 911 (9th Cir.1980).

The Fifth Circuit and this circuit have utilized a two-tier standard in border search cases. The first tier is termed "mere suspicion." The second tier is termed "reasonable suspicion." Within this second tier, the amount of "reasonable suspicion" required increases with the intrusiveness of the search. More "reasonable suspicion" is required for a body cavity search (probing of body cavities) than a strip search (removal of clothing).

"Mere suspicion" is sufficient to permit a pat-down search at the border, as such searches are a part of routine border inspection. *United States v. Sandler,* 644 F.2d 1163, 1167 (5th Cir.1981) (en banc).

In *Sandler,* the court concluded that examination of a person by ordinary pat-down or frisk, the requirement that outer garments such as coat or jacket, hat or shoes, be removed, that pockets, wallet or purse be emptied, are part of the routine examination of a person's effects which require no justification other than the person's decision to cross our border. The fact that such a search occurs at a border makes it reasonable within the meaning of the fourth amendment. *Id.* at 1169. Thus, no suspicion other than the subjective response of a customs official who considers that the circumstances make such a search appropriate is necessary.

In this circuit, the standard for conducting a strip search at a border requires that customs officials have "reasonable suspicion" that the party to be searched is concealing contraband on his person. *United States v. Carter,* 590 F.2d 138, 139 (5th Cir.), *cert. denied,* 441 U.S. 908, 99 S.Ct. 2001, 60 L.Ed.2d 378 (1979); *United States v. Smith,* 557 F.2d 1206, 1208 (5th Cir.1977), *cert. denied,* 434 U.S. 1073, 98 S.Ct. 1259, 55 L.Ed.2d 777 (1978). With respect to strip searches, "reasonable suspicion" includes a requirement that customs officials have cause to suspect that contraband exists in the particular place which the officials decide to search. *United States v. Himmelwright,* 551 F.2d 991, 995 (5th Cir.), *cert. denied,* 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977). The reasonable suspicion standard has been held to have been met if a person behaves in an articulably suspicious manner. *United States v. Carter,* 590 F.2d 138 (5th Cir.), *cert. denied,* 441 U.S. 908, 99 S.Ct. 2001, 60 L.Ed.2d 378 (1979); *Himmelwright,* 551 F.2d at 995–96.

"Our cases have recognized three distinct kinds of border searches of persons: frisk or pat-downs, strip searches, and body-cavity searches. These three categories are subject to different standards because of the varying degrees of intrusion that they entail." *United States v. De*

*Gutierrez*, 667 F.2d 16, 19 (5th Cir. Unit B 1982). Thorough research does not reveal the exact degree of suspicion required for body cavity searches, but we know that due to the greater degree of intrusion involved, the standard demands a greater degree of suspicion than does a strip search.

Where along the sliding scale of reasonable suspicion should an unconsented to x-ray search fall? I dissent in this case because of my disagreement with the majority's placement of x-ray searches on the sliding scale. As I view these cases, two issues, not one, must be decided: (1) what level of suspicion is required before a suspected "swallower" may be detained for more than the reasonable time required for questioning, and (2) what level of suspicion is required to subject a suspected swallower to an x-ray search.

As to the first issue, involving detention, I would hold that to detain a person longer than is reasonably necessary for questioning and investigation of leads, customs officials must have the same suspicion necessary to conduct a strip search, i.e. a particularized reasonable suspicion. Reality indicates that mere detention, in these cases, will always result in consent or a search. I would hold that the search begins when the period of detention for questioning becomes unreasonable. Consequently, that is the time strip search reasonable suspicion must be present.

As to the x-ray search, I would hold that the highest standard of reasonable suspicion would apply.[2] That is, the same degree of suspicion required for a body cavity search. X-ray examinations are harmful to people, especially pregnant women. Therefore, the x-ray search has an element which is absent from the pat-down, strip search, or even the body cavity search. In none of the searches which we have to this time passed upon presented, as a result of the search technique, a danger to the life of the suspect. Because of this difference, I would hold that the government may not

subject any person seeking to enter or re-enter our country to the risk of diminished health without the highest degree of reasonable suspicion.

I realize that the x-ray search standard I urge, without an informant's tip, may be difficult to reach. On the other hand, since detention based on a lower standard over a long period of time, under these circumstances, equals a search or consent, customs officers should be able to ferret out the internal carriers of contraband from innocent travelers.

---

**2.** It is time for the Eleventh Circuit to identify this third level of suspicion by a separate name. Perhaps, "substantial suspicion" would be workable.