**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Jose Jaime CASTANEDA–CASTANEDA
and Betulia Jara De Castaneda,
Defendants-Appellants.**

**No. 83–5064.**

United States Court of Appeals,
Eleventh Circuit.

April 16, 1984.

---

Gary S. Pont, Kenneth E. Cohen and Charles G. White, Asst. Federal Public Defenders, Miami, Fla., for defendants-appellants.

Stanley Marcus, U.S. Atty., Roberto Martinez, Linda Collins Hertz and James G. McAdams, III, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before RONEY, HATCHETT and ANDERSON, Circuit Judges.

RONEY, Circuit Judge:

Jose Jaime Castaneda-Castaneda and his wife, Betulia Jara de Castaneda, were convicted of importation and possession of cocaine with intent to distribute in violation of 21 U.S.C.A. §§ 952(a) and 841(a)(1). The Castanedas attempted to smuggle cocaine into this country in their digestive tracts. When questioned by customs officials they confessed and x-rays confirmed the truth of these confessions. The Castanedas challenge the district court's denial of a motion to suppress the incriminating statements and the cocaine detected by the x-ray examination. Having concluded that the confessions were voluntary and that the use of an x-ray was a reasonable border search, we affirm.

The Castanedas flew into Miami International Airport from Bogota, Colombia. While they were standing in the customs line, they caught the attention of a customs inspector because of their extreme passivity. He detained them for a further customs inspection.

The inspector first examined their passports, customs declaration, and airline tickets. He noticed that the customs declaration had been filled out incorrectly. The Castanedas had listed the Hotel Edison as their permanent address and the wife's name was listed in the place indicated for the address while in the United States.

Next, the inspector questioned the Castanedas about a previous trip, the purpose of this trip, and their occupations. Jose Castaneda's passport revealed that he had come to the United States only two months earlier. He claimed that this was a vacation but he could not remember the motel where he had stayed or the places he had visited. The Castanedas stated that this trip was a vacation as well. They said they planned to go to Disney World. Nevertheless, their plane tickets were from Bogota to Miami to New York and back by the same route.

In regard to their occupations, Jose Castaneda said he was a retail ceramics dealer and his wife claimed to be just a housewife. In questioning the husband about his business, however, the inspector received answers he considered to be ridiculous. Jose Castaneda said he paid his employees 100,000 pesos a month. The inspector figured this was the equivalent of $1,400 a month, an outlandish amount for Colombia. When asked about his monthly deficit, Castaneda's answer showed he did not understand the concept of a deficit. During this questioning, the inspector noticed that Betulia Castaneda's carotid artery was rapidly pulsating, indicating to him that she was nervous. He also noticed that her hands were very rough and red despite a fresh manicure. He thought this indication of manual labor was unusual for a woman who purported to be in the middle or upper-middle class.

Based on these circumstances, the inspector directed the Castanedas to separate search rooms. Accompanied by a female inspector, he first questioned the wife. After reading Mrs. Castaneda the *Miranda* rights, he told her he suspected that she was carrying cocaine internally and asked if she would submit to a x-ray examination. She responded that she would do anything her husband would do.

The inspector then went to the search room where Jose Castaneda was being held. He read him the *Miranda* rights and obtained a waiver. Employing an interrogation ploy, the inspector told Castaneda that his wife had confessed. Castaneda admitted that he had swallowed an unknown number, probably over a hundred, cocaine-filled balloons. Returning to the wife with this admission, the inspector obtained her statement that she had swallowed about 80 cocaine-filled balloons. At some point while in the search rooms, the Castanedas were patted-down and strip-searched with negative results.

After gaining the Castanedas' consents to x-ray examinations, the inspector turned them over to other agents to be transported to a local hospital. The x-rays revealed foreign objects in both of their digestive tracts. Subsequently, Jose Castaneda excreted 131 pellets containing 548 grams of cocaine and Betulia excreted 70 pellets containing 286 grams of cocaine.

The Castanedas first argue that their confessions were involuntary. The standard for evaluating the voluntariness of a confession is whether a person "made an independent and informed choice of his own free will, possessing the capability to do so, his will not being overborne by the pressures and circumstances swirling around him." *Jurek v. Estelle*, 623 F.2d 929, 937 (5th Cir.1980) (en banc) *cert. denied*, 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981). Voluntariness depends on the totality of the circumstances and must be evaluated on a case-by-case basis. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973).

■ As support for their assertion of involuntariness, the Castanedas point to the trick used by the customs inspector and the fact that they are uneducated foreigners. It is clear, that the police's use of a trick alone will not render a confession involuntary. *Frazier v. Cupp,* 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); *United States ex rel. Brandon v. LaVallee,* 391 F.Supp. 1150, 1152 (S.D.N.Y.1974); *Moore v. Hopper,* 389 F.Supp. 931, 934–35 (M.D.Ga.1974) *aff'd,* 523 F.2d 1053 (5th Cir. 1975). In cases involving police trickery where a confession has been held involuntary there have been other aggravating circumstances as well. In *Spano v. New York,* 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959), the Supreme Court held involuntary a confession which was obtained in part by police deception. Spano was indicted for murder and after calling a friend on the police force and consulting with his attorney he surrendered to the authorities. For five hours he was questioned in a round-robin fashion by a district attorney and several members of the police department despite his refusal to give any information but his name. A police lieutenant then asked Spano's friend on the force to participate in the interrogation. The friend was instructed to tell Spano that Spano's earlier call to him had gotten him in a great deal of trouble, and he feared he would lose his job and not be able to support his pregnant wife and three children. Although this attempt to gain false sympathy was at first unsuccessful, after four sessions lasting well into the early morning hours, Spano confessed. In evaluating the voluntariness of the confession, the Court took into account that Spano was foreign-born, had only one-half year of high school education, and had a history of emotional instability. These facts combined with the extended late-night questioning which included police trickery, convinced the court that Spano's will had been overborne. *Id.* at 323, 79 S.Ct. at 1207; *accord Robinson v. Smith,* 451 F.Supp. 1278 (W.D.N.Y.1978) (confession involuntary when defendant with fifth grade education questioned all night, not told of constitutional rights, mis-leadingly informed he would benefit by confessing, and presented with a false confession by his accomplice).

■ Although the Castanedas were subjected to police deception in a foreign environment, their interrogation was sufficiently free of coercive elements to render their confessions voluntary. The customs inspector explained to the Castanedas in great detail the rights they had under *Miranda.* They were read the rights in their native tongue and all questioning was conducted in that language. Finally, the interrogations were short. Both Castanedas confessed after only a few minutes of questioning. We hold that the confessions were properly admitted against the Castanedas by the district court.

■ In any event, even without the Castanedas' confessions, the customs inspector's prior questioning had revealed sufficient indicia of internal drug carrying to warrant the x-ray searches conducted here. At the border, a customs inspector must have a suspicion, reasonable under the circumstances, that a person may be carrying drugs internally before a person's stomach may be searched by x-ray. The reasonable suspicion standard requires a showing of articulable facts which are particularized as to the person and as to the place that is to be searched. *United States v. Vega-Barvo,* 729 F.2d 1341, (11th Cir. 1984).

Although the facts of this case differ from those in the other cases decided today in that the Castanedas were traveling together, this circumstance is unimportant. As was stated in *Vega-Barvo,* what is significant for the reasonable suspicion standard is not the presence of generalized profile characteristics but articulable individualized suspicious behavior. *Id.* at 1349. The Castanedas behaved in an articulably suspicious manner. They initially caught a customs inspector's eye because of their extreme passivity. Their answers to the customs inspector's routine questions only heightened the inspector's suspicions. Jose Castaneda was not able to give a credible

account of his previous trip to Miami. His explanation of their present itinerary failed to coincide with their plane tickets. Finally, his claim to run a ceramics store was impeached by his superficial knowledge of basic business matters. The Castanedas' inability to present a credible story increased the significance of the customs inspector's observation of such minor incongruities as the incorrectly filled out customs declaration and Betulia Castaneda's attempt to disguise rough hands with a fresh manicure.

Under these circumstances, the customs inspector in light of his experience, reasonably suspected the Castanedas of carrying drugs internally. The x-ray search which revealed cocaine was not a violation of the Fourth Amendment.

AFFIRMED.

HATCHETT, Circuit Judge, dissenting:

I dissent for the reasons stated in *United States v. Vega-Barvo*, 729 F.2d 1341 (11th Cir.1984).