CARNES, Circuit Judge,
concurring:
I write separately to flesh out the facts and circumstances that support this Court’s conclusion that the customs inspectors did not violate plaintiff Janneral Den-son’s constitutional rights and also to discuss why that conclusion leads to judgment for the United States on the FTCA claims.[1]
I.
Earlier this year we held in Nguyen v. United States, 556 F.3d 1244 (11th Cir.2009), that the United States has waived its sovereign immunity for the six tort claims listed in the proviso to 28 U.S.C. § 2680(h), when those claims arise from the actions of federal investigative or law enforcement officers. In that case the three torts were false arrest, false imprisonment, and malicious prosecution. Id. at 1246. The facts, as they were presented at that stage of the proceeding, id. at 1248 n. 1, were that a federal law enforcement *1350 officer had violated the Constitution by participating in the arrest and prosecution of the plaintiff without anything resembling probable cause, id. at 1248-49. Because the tort claims in the Nguyen case grew out of constitutional violations, we had no occasion to decide whether the § 2680(h) proviso has any application to tort claims that are not based on constitutional violations. See Watts v. BellSouth Telecomms., Inc., 316 F.3d 1203, 1207 (11th Cir.2003) (“Whatever their opinions say, judicial decisions cannot make law beyond the facts of the cases in which those decisions are announced.”); United States v. Aguillard, 217 F.3d 1319, 1321 (11th Cir.2000) (“The holdings of a prior decision can reach only as far as the facts and circumstances presented to the Court in the case which produced that decision.” (citation omitted)).
By the same token, we have no occasion in this case to decide how the FTCA might apply if the actions of the customs inspectors toward the plaintiff had been unreasonable or unconstitutional. Any implication in the majority opinion about how the FTCA might apply in those different circumstances is non-binding dicta. See Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 379, 114 S.Ct. 1673, 1675, 128 L.Ed.2d 391 (1994) (“It is to the holdings of our cases, rather than their dicta, that we must attend .... ”); Swann v. So. Health Partners, Inc., 388 F.3d 834, 837 (11th Cir.2004) (“[T]he prior panel rule does not extend to dicta.”); McDonald’s Corp. v. Robertson, 147 F.3d 1301, 1315 (11th Cir.1998) (Carnes, J., concurring) (“[Djicta in our opinions is not binding on anyone for any purpose.”).
The plaintiffs FTCA claims, which are set out in Count XI of the second amended complaint, are based on acts of the Customs Service Director and inspectors working under his supervision that the plaintiff contends violated her rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. See 2nd Amend. Complaint at ¶ 145 (“The warrantless detention, searches, handcuffing, assault, battery, and forced medication and improper treatment of the plaintiffs by Defendants ... were undertaken without legal basis and these actions were in violation of the laws of the State of Florida, and in violation of the Fourth, Fifth, Eighth, and Fourteenth Amendments of the United States Constitution.”). The majority concludes that the acts of the customs inspectors were reasonable under the circumstances and therefore did not violate the Constitution. After studying the record, I agree for reasons I will explain in Part II, infra.
After finding that the plaintiffs constitutional rights were not violated, the next question is whether her FTCA claims can survive anyway. The reason that this question arises is because the FTCA incorporates state law, specifically each state’s elements of battery, false imprisonment, false arrest, and assault. See 28 U.S.C. § 2680(h); 28 U.S.C. § 1346(b)(1) (stating the general waiver of sovereign immunity applies “where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred”); Miles v. Naval Aviation Museum Found., Inc., 289 F.3d 715, 722 (11th Cir.2002) (“The FTCA creates liability for the United States only if the act at issue is a tort in the state where the conduct occurred.”).
But the majority does not ask whether the plaintiff has alleged a tort other than those based on the alleged constitutional violations. It does not ask whether Florida law even allows a battery, false imprisonment, false arrest, or assault claim against a law enforcement officer when there is no constitutional violation. Instead, the majority sidesteps those ques *1351 tions because of its apparent belief that it does not matter what the plaintiff pleaded or what Florida law says. According to the majority, regardless of whether the plaintiff has pleaded any claims that do not depend on constitutional violations, or whether Florida law would allow them if she had, the Supremacy Clause would bar those claims anyway. Maj. Op. at 1343-44. I do not think that is the best approach, although I agree that the plaintiff loses for two reasons.
First, as I read the plaintiffs second amended complaint, the basis for her FTCA claim is the custom inspectors’ alleged violations of her Fourth, Fifth, Eighth, and Fourteenth Amendment rights. See 2nd Amend. Complaint at ¶ 145. By her own description of the FTCA claim, it depends on her allegation that the inspectors violated her constitutional rights. Because we determine that there was no constitutional violation, the FTCA claim fails. It is that simple.
Second, even if the plaintiff had pleaded tort claims that did not rely on constitutional violations by the federal officers, Florida law would not allow them. Florida, like other states, recognizes a defense of justification which frees law enforcement officers from liability for actions reasonably taken in pursuit of their duty to enforce the law. See generally, e.g., City of Miami v. Sanders, 672 So.2d 46, 47 (Fla. 3d DCA 1996) (recognizing that Florida law provides for justifiable force by law enforcement officers, which is “a complete defense” to a battery or excessive force claim); City of Miami v. Albro, 120 So.2d 23, 27 (Fla. 3d DCA 1960) (“[I]n order to recover [on a false imprisonment claim] it must be shown that the restraint was unreasonable and was not warranted by the circumstances.”); id. (“Florida has recognized ... that to cause a person’s imprisonment for the purpose of vindicating public justice is not ordinarily actionable.”). Because Florida law does not impose liability on law enforcement officers who act in a reasonable and constitutional manner in carrying out their duties, as a matter of state law the customs inspectors did not commit the torts that the plaintiff attempted to use as the basis for her FTCA claim. No state torts means no FTCA claim. See 28 U.S.C. § 1346(b)(1). It is that simple.
The majority, however, assumes that Florida law would permit tort claims against federal law enforcement officers for the lawful discharge of their duties in a reasonable and constitutionally permissible manner. That assumption is wrong. No one has cited, nor have I been able to find, any Florida decision that supports the notion that the state law claims the plaintiff has asserted against the United States as FTCA claims could survive a finding that the customs inspectors acted reasonably and in a constitutional manner.
But on the basis of its incorrect assumption that Florida law would allow such a claim, the majority believes that it has rooted out “a direct conflict between state law and federal law.” Maj. Op. at 1348. Thus, the majority turns to the Supremacy Clause and dusts off decisions from the nineteenth century, all of which pre-date the FTCA, to establish the unstartling proposition that state law cannot be used to interfere with a federal officer’s proper performance of federal law duties. See Majority Op. at Part III.B. That has been settled law for more than a hundred years. But all it says is that the Supremacy Clause prohibits a state from imposing liability on the United States for actions of its law enforcement officers that were taken in full compliance with federal law, including the federal Constitution.
That is obviously true, with one important caveat. The Supremacy Clause does not prevent federal law from permitting federal liability in these or any other cir *1352 cumstanees. The sovereign is sovereign over questions of sovereign immunity. And the sovereign’s will in this area of the law has been expressed in the FTCA, which incorporates state tort law as a matter of federal law. See 28 U.S.C. § 1346(b)(1); Miles, 289 F.3d at 722. The majority’s assertion that there is a Supremacy Clause issue here relies on there being a “direct conflict” between state and federal law. See Maj. Op. at 1348. But under the FTCA, there can be no such conflict because the sovereign has incorporated state tort law into federal law to the extent stated in that statute. The supreme law of the land on this question is the FTCA.
Of course, the FTCA does not necessarily allow liability whenever state tort law freed of the United States’ sovereign immunity might impose it. Whether a different part of the FTCA, possibly § 2680(a) (providing that sovereign immunity is not waived for “[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation”), might prohibit holding the United States liable for the constitutionally permissible actions of its officers is a question for another day. It is not a question for today because, as I have explained, Florida tort law does not impose liability in these circumstances even if the FTCA allowed it to do so and even if the plaintiff had pleaded a claim not dependent on a constitutional violation.
II.
I do agree with the majority that reasonable suspicion existed to justify the custom inspectors’ actions, but I reach that conclusion for some reasons that are not included in the majority’s discussion. I begin by summarizing the facts that provided the customs inspectors with reasonable suspicion to believe that plaintiff Den-son was carrying drugs internally.
Denson had in her possession a highly suspicious script of what to say when questioned; she was arriving from Jamaica, a source country; she was traveling with only a carry-on bag and a purse; her trip was short (one full day and two nights); she could not provide her husband’s address and phone number even though she said she had been visiting him; a third party whose name she did not know bought her ticket; the TECS system showed an alert for her (although the primary alert had expired); she was pregnant and there is a trend of using pregnant women as internal narcotics couriers because they cannot be x-rayed, making drugs carried in their digestive tracts more difficult to detect. See United States v. Vega-Barvo, 729 F.2d 1341, 1350 (11th Cir.1984) (“Since swallowers [of drugs] follow a different mode of operation, customs agents’ suspicions will be aroused by different factors. For example, suspicion will not focus on bulky dress ... but on the traveler’s inability to explain his or her trip.” (citation omitted)). Articulable facts that were particularized to the place and person to be searched existed in this case throughout the series of increasingly invasive searches. See id. at 1349.
Each search ruled out the presence of drugs in a particular area or cavity of Denson’s body, but the customs inspectors’ reasonable suspicion that drugs were in her digestive tract was not dispelled until the monitored bowel movement search was completed. The earlier searches revealed no drugs, and each search removed any suspicion that Denson was carrying drugs in the specific area or cavity of the body where no drugs were found. See Brent v. Ashley, 247 F.3d 1294, 1300 (11th Cir.2001) (“[A]s a search progresses from a stop, to a pat-down search, to a strip search, an agent must reevaluate whether reasonable suspicion to justify the next level of intrusion exists in light of the information gained during the encounter.”). After the *1353 initial stop (which included a pat down and luggage search), the restroom search, the pelvic exam, and the ultrasound uncovered no drugs and revealed that there were medical risks involved in searching further, the danger went up and reasonable suspicion had to be reassessed. See VegaBarvo, 729 F.2d at 1348 (stating that “as medical danger increases because of a search procedure, so must the reasons for conducting the procedure”).
Nonetheless, the customs inspectors’ actions — all the way through the final monitored bowel movement search in the hospital — were justified because the facts, taken as a whole, supported their reasonable suspicion that Denson was carrying drugs in her digestive tract, and that suspicion was not allayed until after the bowel movement search. See United States v. Montoya de Hernandez, 473 U.S. 531, 541-42, 105 S.Ct. 3304, 3311, 87 L.Ed.2d 381 (1985) (holding that customs inspectors must have “a particularized and objective basis for suspecting the particular person of alimentary canal smuggling” (quotation marks omitted)); Vega-Barvo, 729 F.2d at 1350 (“The standard ... must be whether under the ‘totality of the circumstances’ an experienced customs inspector would reasonably believe the traveler was carrying contraband.”).
Furthermore, the manner of the searches was reasonable. See United States v. Pino, 729 F.2d 1357, 1359-60 (11th Cir.1984) (“The manner of [an internal] search is significant in determining its reasonableness.”). Denson could not be xrayed because she was pregnant, and based on the reasonable suspicion that she was carrying drugs in her digestive tract, it was permissible for customs inspectors to detain her at the hospital to monitor her bowel movements. See United States v. Mosquera-Ramirez, 729 F.2d 1352, 1357 (11th Cir.1984) (“The detention of persons at the border long enough to reveal by natural processes that which would be disclosed by a more expeditious x-ray search cannot be held to be an unreasonable seizure. Nor can the search of the results of that natural process be held to be an unreasonable search.”); United States v. De Montoya, 729 F.2d 1369, 1371 (11th Cir.1984) (“Once Montoya refused an x-ray, her detention until natural bodily functions brought forth the fecal matter and stomach contents which the officials were entitled to search did not violate the Constitution ....”).
Denson was at a hospital where doctors and nurses monitored her medical condition and made professional judgment calls about her high risk pregnancy. The pelvic exam, the ultrasound, and the bowel search were all conducted in that hospital setting. Cf. Evans v. Stephens, 407 F.3d 1272, 1281-82 (11th Cir.2005) (en banc) (concluding that the constitutional violation was obvious in a non-emergency situation where a police officer took arrestees to a broom closet or supply room and conducted body cavity searches in a degrading, forceful, and unsanitary manner). Denson was prescribed a laxative to speed up the bowel search, a procedure we have permitted where customs inspectors reasonably suspect that someone is carrying drugs internally. See United States v. Saldarriaga-Marin, 734 F.2d 1425, 1428 (11th Cir.1984) (“Once the Customs officers developed reasonable suspicion that Marin was an internal carrier, they could permit nature to run its course or ask Marin to speed up the process by taking the laxative.”). The use of a laxative in this case, however, is troubling because Denson’s pregnancy was high risk. Even so, the hospital defendants were aware of that fact and they, not the customs inspectors, made the medical decision that the use of the laxative was appropriate.[2] It was not *1354 administered in a violent or forced manner, and if Denson ultimately had refused to take the laxative, she could have been detained at the hospital until nature took its course.[3] See Pino, 729 F.2d at 1360 (“In the absence of consent, the agents can detain you until nature reveals the truth or falsity of their suspicions.”). The customs inspectors reasonably suspected that Den-son was carrying drugs in her digestive tract, and regarding the manner of the search they reasonably relied on the judgment of medical professionals about its safety.
III.
I would affirm the district court’s judgment on the FTCA claim because the customs inspectors had reasonable suspicion to conduct the searches, they acted reasonably, and there was no constitutional violation. As a result, the state law torts the plaintiff alleged did not occur. See Miles, 289 F.3d at 722. I would affirm the district court’s judgment on the plaintiffs Bivens claims because no constitutional violation occurred. See Rodriguez v. Ritchey, 556 F.2d 1185, 1186 (5th Cir.1977).[4] I agree with the majority opinion’s resolution of the issues involving the other claims.

. In regard to the FTCA claims, references to "the plaintiff' or "Denson” in this opinion include Denson’s son, Jordan Taylor. See Maj. Op. at 3092 n. 18.

. Denson did present some expert testimony that the medical attention she received at *1354 Jackson Memorial Hospital was below the professional standard of care in the community and that it caused the premature birth of her baby. R:204:Ex. S (affidavit of Steven Pliskow, M.D., F.A.C.O.G.). Dr. Pliskow testified that a "breach of the standard of care significantly increased the likelihood of a premature delivery of Janneral Denson by emergency caesarean.” Id. at 6. Dr. Pliskow testified in his deposition that Nurse Reynauld, Nurse Thompson, and Dr. Amadio signed an order prescribing the laxative to Denson, R:290 at 163, which "started the whole cascade” that caused pre-term delivery of Den-son’s baby. Id. at 175. In other words, Den-son’s own expert testified that the hospital defendants' actions in prescribing the laxative — not the actions of the customs inspectors — caused that injury.
Denson also submitted the affidavit of Susan Wheatley, R.N. R:204:Ex. T. Wheatley testified that the nurses at Jackson Memorial "failed to advise or inform customs officers of Janneral Denson’s medical condition with respect to initiation of the 'protocol used for packers,’ and ‘U.S. Customs Standard of Care Form.’ ” Id. at 3. Thus Denson’s own expert testified that the customs inspectors were not informed about how Denson’s medical condition would be affected by the standard procedures used to search people suspected of being internal drug carriers.

. In her initial brief Denson contended that she never consented to any examinations or treatment and that she was "forced” to take the laxative. In her supplemental brief, however, she stated that she "simply gave up and drank the [laxative] in order to put an end to her ordeal.”

. In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.