[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-10020

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 07, 2008
THOMAS K. KAHN
CLERK

D. C. Docket No. 98-02651-CV-WPD

CBS BROADCASTING INC., et al.,

Plaintiffs-Counter-
Defendants,

FOX BROADCASTING COMPANY,
FBC TELEVISION AFFILIATES ASSOCIATION,
ABC TELEVISION AFFILIATES ASSOCIATION,
NBC TELEVISION AFFILIATES,
CBS TELEVISION AFFILIATES ASSOCIATION,

Plaintiffs-Counter-
Defendants-Appellants-
Cross-Appellees,

versus

ECHOSTAR COMMUNICATIONS CORPORATION,
d.b.a. DISH Network,
ECHOSTAR SATELLITE CORPORATION,
SATELLITE COMMUNICATIONS OPERATING CORPORATION,
DIRECT SAT CORP.,

Defendants-Counter-
Claimants-Appellees,

MICHAEL MOUNTFORD,
NATIONAL PROGRAMMING SERVICE, LLC,

Proposed
Intervenors-
Cross-Appellants.

_____

No. 07-10178

_____

D. C. Docket No. 98-02651-CV-WPD

CBS BROADCASTING INC., et al.,

Plaintiffs-Counter-
Defendants,

FOX BROADCASTING COMPANY,
FBC TELEVISION AFFILIATES ASSOCIATION,
ABC TELEVISION AFFILIATES ASSOCIATION,
NBC TELEVISION AFFILIATES,
CBS TELEVISION AFFILIATES ASSOCIATION,

Plaintiffs-Counter-
Defendants-Appellants,

versus

ECHOSTAR COMMUNICATIONS CORPORATION,
d.b.a. DISH Network,
ECHOSTAR SATELLITE CORPORATION,
SATELLITE COMMUNICATIONS OPERATING CORPORATION,
DIRECT SAT CORP.,

2

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

**(July 7, 2008)**

Before WILSON, COX and BOWMAN,[*] Circuit Judges.

WILSON, Circuit Judge:

The issue before us is whether the nationwide, permanent injunction mandated by the Satellite Home Viewer Act of 1988, Pub. L. No. 100-667, tit. II, 102 Stat. 3949 ("SHVA"), prohibits Appellee EchoStar Communications Corporation ("EchoStar") from leasing its transponder to National Programming Service, LLC ("NPS"), thereby allowing NPS to retransmit distant network programming to eligible subscribers. *See* 17 U.S.C. § 119(a)(7)(B)(i). We agree with the district court that EchoStar is not in violation of § 119(a)(7)(B)(i). We affirm.

## I. BACKGROUND

Appellant Fox Broadcasting Company ("Fox") is the respective owner of

_____

[*]Honorable Pasco M. Bowman II, United States Circuit Judge for the Eighth Circuit, sitting by designation.

the Fox television network. Fox possesses the copyrights or exclusive rights in numerous television programs broadcast by Fox network stations. Appellants CBS Television Affiliates Association, ABC Television Affiliates Association, FBC Television Affiliates Association, and NBC Television Affiliates are the respective trade associations representing hundreds of CBS, ABC, Fox and NBC affiliate stations. All appellants will hereafter be referred to as the "Networks."

During the 1990s, EchoStar began providing satellite television programming to subscribers with small (18 inch) satellite dishes, and conducted its business under the name "DISH NETWORK." The SHVA provided satellite carriers such as EchoStar a compulsory, statutory license to engage in secondary transmissions[1] of copyrighted distant network programming[2] to unserved

---

[1] A secondary transmission (also termed "retransmission") is defined as "the further transmitting of a [broadcast station's] primary transmission simultaneously with the primary transmission." 17 U.S.C. § 111(f). A "primary transmission" is defined as "a transmission made to the public by the transmitting facility whose signals are being received and further transmitted by the secondary transmission service, regardless of where or when the performance or display was first transmitted." *Id*.

[2] "Distant network signals are network stations from outside a subscriber's market area. For example, a person who lives in Fort Lauderdale but receives an ABC, CBS, Fox or NBC network station from New York City is receiving 'distant network programming' or 'distant network stations.'" *CBS Broad., Inc. v. EchoStar Commc'ns Corp.*, 450 F.3d 505, 508 n.1 (11th Cir. 2006) (quoting *CBS Broad., Inc. v. EchoStar Commc'ns Corp.*, 276 F. Supp. 2d 1237, 1241 (S.D. Fla. 2003)).

households.[3]

In November 1998, the Networks filed suit in the United States District Court for the Southern District of Florida claiming that EchoStar was infringing on the Networks' copyrights by providing distant network programming to served—as opposed to unserved—households. In 2003, after a two-week bench trial, the district court found that EchoStar retransmitted the Networks' programs to hundreds of thousands of served households, which constituted "willful or repeated" copyright infringement under 17 U.S.C. § 119(a)(7)(A). *CBS Broad., Inc. v. EchoStar Commc'ns Corp.*, 450 F.3d 505, 509, 516 (11th Cir. 2006). The district court declined to issue the severe "pattern or practice" injunction under 17 U.S.C. § 119(a)(7)(B); instead, it "crafted an injunction designed to remedy . . . individual violations of the Act." *Id*. at 517. On appeal, we held that EchoStar had indeed engaged in a "pattern or practice" of secondary transmissions to served households on a nationwide basis in violation of § 119(a)(7)(B). *Id*. at 526. We remanded the case to the district court for the entry of a nationwide permanent injunction barring EchoStar from providing distant network programming pursuant to § 119(a)(7)(B). *Id*. at 527. On remand, the district court entered the

---

[3]Unserved households are households that are unable to receive network programming at a specified level of intensity through the use of conventional rooftop antennas. *Echostar*, 450 F.3d at 508.

mandated permanent injunction on October 20, 2006, which was to take effect on December 1, 2006.

On November 29, two days before the effective date of the injunction, EchoStar entered into a lease agreement ("Lease Agreement") with NPS, a satellite programming provider that has been in the business of providing television programming (including distant network broadcast signals) for more than ten years.[4] Under the Lease Agreement, NPS leases a transponder[5] on EchoStar's satellite.[6] In exchange for use of the transponder, NPS pays EchoStar $150,000 per month.[7] The rent payments are not tied to providing distant network programming signals to subscribers. NPS is obligated to make the payments for at least two years from the date of the contract whether or not NPS signs up any

[4]NPS and EchoStar are separate and distinct companies that do not share any officers, directors, management, employees, or shareholders. Neither has an ownership interest in the other, and NPS has done business with, and competed against, EchoStar in the past. (NPS's Response Brief at 8.)

[5]A transponder collects signals sent up from earthbound transmission stations and manipulates the signals by reassigning them to different frequencies. The transponder then transmits the signals back down to individual satellite dishes owned by the subscribing viewer. (Appellants' Initial Brief at 5.)

[6]The events leading up to the Lease Agreement had been set in place six months earlier, when NPS approached EchoStar with the idea of offering distant network channels to EchoStar's unserved subscribers who were going to lose service as a result of the anticipated permanent injunction. (NPS's Response Brief at 9.) NPS has entered into similar lease agreements with companies other than EchoStar. (*Id*. at 10.)

[7]NPS also pays "an interim $5,000 monthly antenna fee" to NPS. (Appellees' Response Brief at 15.)

subscribers for distant network programming. EchoStar does not receive, or share in, any revenues or profits received by NPS's provision of distant network programming. In addition, the Lease Agreement:

(1) Establishes NPS as the owner of distant network subscriber information and other related rights;

(2) Requires NPS to be responsible for the collection, transport, delivery, reception, monitoring, and uplinking of all signals to be transmittted using the leased transponder;

(3) Permits NPS to offer distant network channels to all eligible consumers, not just EchoStar subscribers;

(4) Prevents EchoStar from determining subscriber eligibility, or from activating or de-activating distant network subscribers; and prevents NPS from using EchoStar's call center, subscriber management, and other systems to determine subscriber eligibility, activate, and deactivate subscribers;

(5) Requires NPS to independently contract with Decisionmark[8] to determine subscriber eligibility;

(6) Requires consumers to contact NPS directly in order to subscribe to distant

---

[8]Decisionmark Corporation is a third party vendor who uses an approved scientific methodology to determine which potential subscribers are unserved and therefore eligible to receive distant network signals.

7

network channels;

(7) Prohibits EchoStar from disconnecting distant nework programming to NPS customers, even if those customers are also EchoStar customers and fail to pay EchoStar for the programming they receive from EchoStar;

(8) Prevents EchoStar from billing or collecting payments from distant network subscribers and requires that NPS use its own systems for billings and collection (if EchoStar and NPS share the same customer, the customer receives and pays two separate bills);

(9) Permits NPS to charge whatever price it desires for the services it delivers, including distant network programming;

(10) Requires NPS to pay all costs associated with NPS's provision of distant network programming to eligible consumers;

(11) Requires NPS to pay all taxes related to distant network subscribers; and

(12) Requires NPS to ensure compliance with Section 119 of the SHVA, including the payment of royalty fees and filing of necessary submissions.

In compliance with the injunction, EchoStar disconnected distant network channels to all of its approximately 900,000 distant network subscribers, which has caused EchoStar a loss of more than twenty-five million dollars annually.

Upon becoming aware of the Lease Agreement, the Networks moved the

district court to issue an order to show cause why EchoStar and NPS should not be held in contempt of the October 20 injunction. On December 1, 2006, the Networks alternatively moved for clarification[9] of the October 20 injunction prohibiting the EchoStar-NPS lease agreement. The district court denied both motions, holding that the injunction did not prohibit EchoStar from acting as a passive conduit for NPS's retransmissions of distant network programming:

> Neither the Act nor the mandate impose a requirement that EchoStar refrain from any business with customers formerly receiving distant network signals, nor does it prohibit other providers from transmitting those signals to those former customers who qualify as unserved under the Act.
> . . . .
> As NPS points out, the injunction required for pattern or practice violations bars not only unlawful conduct but also would otherwise bar the legitimate provision of services under the Act, i.e., providing distant network services to unserved households. . . . What Plaintiffs seek goes beyond that, seeking to bar not only EchoStar from providing such services but also unaffiliated third parties who seek to use EchoStar's already existing equipment to fill a gap in the market. Plaintiffs have not demonstrated that the agreement between EchoStar and NPS is anything but an arms-length business transaction to lease satellite space, or that EchoStar is, at this point, anything more than a conduit for the signals which will be sent by NPS. . . . That EchoStar has found a way to minimize the harm to its customers and itself, and likely prevent a windfall to its competitors, does not require this Court to modify the injunctive relief entered to encompass conduct not intended to be banned by the Act or the Eleventh Circuit's mandate, and the Court does not find good cause

---

[9]The district court construed the motion for clarification as a motion to modify the injunction, determining that the Networks sought to broaden the scope of the injunction to include the lease arrangement between EchoStar and NPS. (D.E. 1121 at 4-5.)

to enter such broad relief.

(D.E. 1121 at 5-6.)

On appeal, the Networks ask us to reverse the district court and hold that EchoStar's participation in the Lease Agreement violates the injunction required by § 119(a)(7)(B)(i).

## II. STANDARD OF REVIEW

Typically, a district court's refusal to clarify or modify an injunction is reviewed for an abuse of discretion, *Dillard v. Baldwin County Comm'rs*, 376 F.3d 1260, 1264-65 (11th Cir. 2004), but a court "by definition abuses its discretion when it makes an error of law," *Koon v. United States*, 518 U.S. 81, 100, 116 S. Ct. 2035, 2047, 135 L. Ed. 2d 392 (1996). Here, where the interpretation of a statute is at stake, our review is de novo. *United States v. Murrell*, 368 F.3d 1283, 1285 (11th Cir. 2004).

## III. DISCUSSION

### A. The Compulsory, Statutory License Under Section 119(a)

Section 119(a)(2) provides satellite carriers with a compulsory, statutory license to conduct secondary transmissions of distant network programming to unserved households. 17 U.S.C. § 119(a)(2)(A)-(B)(i). To secure and maintain the license, the satellite carrier must satisfy a number of statutory requirements.

The satellite carrier must file with the network that owns or is affiliated with the network station the following submissions: (1) a list to be submitted 90 days after commencement of secondary transmissions identifying the name and address of all subscribers to whom distant network programming is retransmitted (17 U.S.C. § 119(a)(D)(i)(I)); (2) a list to be submitted 90 days after commencement of secondary transmissions that is aggregated by a designated market area and indicates persons being served pursuant to § 119(a)(3) relating to significantly viewed stations (17 U.S.C. § 119(a)(D)(i)(II)); (3) a list to be submitted every month identifying any persons who have been added or dropped as subscribers under § 119(a)(D)(i)(I) (17 U.S.C. § 119(a)(D)(ii)(I)); and (4) a list to be submitted every month identifying any persons whose service pursuant to § 119(a)(D)(i)(II) has been added or dropped (17 U.S.C. § 119(a)(D)(ii)(II)).

The satellite carrier must also, on a semiannual basis, deposit with the Register of Copyrights a statement of account, covering the preceding 6-month period, specifying the names and locations of all superstations and network stations whose signals were retransmitted to subscribers at any time during that period, the total number of subscribers that received such retransmissions, and other such data as the Register of Copyrights may from time to time prescribe by regulation. 17 U.S.C. § 119(b)(1)(A).

In addition, the satellite carrier must pay a royalty fee for a 6-month period, computed by multiplying the total number of subscribers receiving each secondary transmission of each superstation or network station during each calendar month by the appropriate rate. 17 U.S.C. § 119(b)(1)(B). Such fees are ultimately distributed (after reasonable costs incurred by the Copyright Office are deducted) to copyright owners whose works were included in a secondary transmission made by a satellite carrier during the applicable 6-month period. 17 U.S.C. § 119(b)(2)-(3).

In the event the satellite carrier sends secondary transmissions to subscribers who are not eligible to receive the transmission (e.g., served subscribers), there are two possible penalties. If the retransmission was "willful or repeated," the satellite carrier is liable for copyright infringement and statutory damages up to $5 for each subscriber for each month. 17 U.S.C. § 119(a)(7)(A)(ii).[10] A more severe penalty (the one that is at issue in this case) is applicable to the satellite carrier engaged in a willful or repeated "pattern or practice." 17 U.S.C. § 119(a)(7)A)(ii). In that instance, in addition to the remedies set forth in § 119(a)(7)(A)(ii), the following penalty applies:

---

[10]No damages, however, shall be awarded if the satellite carrier took corrective action by promptly withdrawing service. 17 U.S.C. § 119(a)(7)(A)(ii).

[T]he court shall order a permanent injunction barring the secondary transmission by the satellite carrier, for private home viewing, of the primary transmissions of any primary network station affiliated with the same network, and the court may order statutory damages of not to exceed $250,000 for each 6-month period during which the patter or practice was carried out.

17 U.S.C. § 119(a)(7)(B)(i).

The scope of the § 119(a)(7)(B)(i) injunction ("the injunction") is tailored to the geographic area where the "pattern or practice" was carried out. 17 U.S.C. § 119(a)(7)(B)(i)-(ii). Because EchoStar was found to have engaged in a "pattern or practice" that was carried out on a substantially nationwide basis, the injunction set against it is permanent and nationwide.

### B. Whether EchoStar is a Satellite Carrier Retransmitting Distant Network Programming

The Networks argue that the injunction, which enjoins a satellite carrier's secondary transmissions of distant network programming, prohibits the Lease Agreement because EchoStar, even in its passive role, continues to act as a satellite carrier engaged in such retransmissions.[11]

---

[11]The parties agree that § 119(a)(7)(B)(i) does not prohibit EchoStar from acting as a satellite carrier with respect to retransmissions of local network programming pursuant to the compulsory license under 17 U.S.C. § 122. (Appellants' Initial Brief at 7.) Section 119(a)(7)(B)(i) only reaches EchoStar acting as a satellite carrier with respect to retransmissions of distant network programming under 17 U.S.C. § 119(a)(2)(A)-(B)(i). *See CBS Broad., Inc. v. EchoStar Commc'ns Corp.*, 450 F.3d 505, 527 (11th Cir. 2006) ("[W]e hold that the district court is required to issue a nationwide permanent injunction barring the provision of distant network programming pursuant to the Act's statutory license").

The parties disagree over whether EchoStar is a "satellite carrier," which is defined as:

> [A]n entity that uses the facilities of a satellite or satellite service licensed by the Federal Communications Commission . . . to establish and operate a channel of communications for point-to-multipoint distribution of television station signals, and that owns or leases a capacity or service on a satellite in order to provide such point-to-multipoint distribution.

17 U.S.C. § 119(d)(6).

Thus, to be a satellite carrier, an entity must: (1) use the facilities of a satellite to establish and operate a channel of communications for point-to-multipoint distribution of television signals; and (2) own or lease a capacity or service on a satellite to provide point-to-multipoint distribution. The parties agree that EchoStar meets the second prong, i.e., EchoStar *owns* the capacity to provide point-to-multipoint distribution. The parties' disagreement is centered on whether EchoStar, despite its passive role, continues to *use* the facilities of the satellite for the purpose of *establishing* and *operating* a channel of communications for point-to-multipoint distribution of television station signals.

"'The first rule in statutory construction is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute. If the statute's meaning is plain and unambiguous, there is no need for further inquiry.'" *United States v. Silva*, 443 F.3d 795, 797-98 (11th Cir.

14

2006) (per curiam) (quoting *United States v. Fisher*, 289 F.3d 1329, 1337-38 (11th Cir. 2002)).  In determining the plain meaning, "we will not 'look at one word or term in isolation, but instead [will] look to the entire statutory context.'"  *Id.* (alteration in original) (quoting *United States v. DBB, Inc.*, 180 F.3d 1277, 1281 (11th Cir. 1999)).

The Networks fail to convince us that EchoStar is "us[ing] the facilities of a satellite . . . to establish and operate a channel of communications for point to multipoint distribution."  Importantly, the verbs are in the present tense.  The satellite carrier must be in the continuing enterprise of *establishing* and *operating* the "channel of communications for point-to-multipoint distribution."  The Networks point out that EchoStar continues to have operational control over the transmission infrastructure of the satellite because NPS is without the requisite license to operate an apparatus for the transmission of satellite television broadcasts under 47 U.S.C. § 301.  The Networks, however, fail to provide any detail on the intricacies and scope of EchoStar's operational control over the transmission infrastructure.  (*See* Appellants' Initial Brief at 24-25; Appellants' Response and Reply Brief at 9 n.3, 27-28.)  Our sense from the Lease Agreement, however, is that EchoStar's role is marginal and can only be viewed as ensuring the proper, technical, functioning of the transponder and the satellite as a whole.

15

(D.E. 1071-4 at ¶¶1.A, 7.B.)  It is NPS that "is responsible for providing, operating and maintaining the equipment necessary to access the [s]atellite and [satellite service]."  (*Id*. at ¶ 7.A.)  It is NPS that is responsible for the collection, transport, delivery, reception, monitoring, and uplinking of all signals to be transmitted.  (*Id*. at ¶¶ 1.A, 4.A.)  It is NPS that is responsible for determining the type of retransmission (e.g., distant or local), the content of the retransmission, and the recipient of the retransmission.  And, it is NPS that is responsible for determining subscriber eligibility, for activating or de-activating subscribers, and for obtaining, servicing, and retaining subscribers.  In light of these facts, we are convinced that only NPS can fairly be viewed as *establishing* and *operating* the channel of communications for point-to-multipoint distribution.

This conclusion that only NPS qualifies as a satellite carrier engaged in the retransmission of distant network programming is all the more clear upon considering the broader, statutory framework.  The SHVA's definition of "satellite carrier" clearly contemplates a satellite owner leasing out its capacity (i.e., transponder and other equipment).  17 U.S.C. § 119(d)(6).  EchoStar tells us that the leasehold arrangement is common in the industry and we are given no reason to disbelieve them.  In such a leasing arrangement, the statute makes clear that lessee becomes a satellite carrier.  *Id*.  Just as any other satellite carrier may do, a

16

lessee satellite carrier may retransmit distant network programming to eligible subscribers pursuant to the compulsory, statutory license provided by 17 U.S.C. § 119(a)(2)(A)-(B)(i). The lessee satellite carrier may only do so, however, if it satisfies all of the requirements for securing and maintaining the license, i.e., the initial and monthly submission of both subscriber lists and designated market lists, the deposit of an account statement into the Register of Copyrights on a semiannual basis, and the payment of royalty fees on a semiannual basis. The Networks do not contend otherwise.[12]

From this premise, it follows that the lessor cannot be a satellite carrier engaging in the retransmission of distant network programming simultaneously with the lessee's own retransmissions of the same kind. For if this were the case, the lessor would be equally subject to the statutory requirements for securing and maintaining a compulsory, statutory license. The statutory language relating to the license and its requirements do not differentiate between lessors and lessees. Thus, *both* would be required to file initial and monthly lists, file semiannual account statements, and pay semiannual royalty fees. But, nowhere does the statutory language infer such duplicity of efforts and expense—let alone a windfall

---

[12]As previously mentioned, NPS is solely responsible for the necessary filings and payments of royalty fees pursuant to Section 119 of the SHVA.

to the copyright owners for twice the amount of royalty fees. It has to be one or the other; they cannot both be satellite carriers. The statute clearly contemplated lessees obtaining the status of satellite carriers, and the same clear intent is not expressed with respect to lessors.

This reading is also bolstered by pragmatic concerns. To require the passive lessor to satisfy § 119(a)'s requirements would make little sense given that the lessor has no knowledge of, or contact with, the subscribers. Subscriber information is the key to calculating the royalty fee and creating the lists and account statement. The lessee is in the best position to do this.

In addition, EchoStar directs our attention to the November 2005 Report and Order issued by the FCC. Therein, the FCC acknowledged that certain "satellite carriers . . . often lease capacity from another entity that is licensed to operate the satellite used to provide service to subscribers." *Implementation of the Satellite Home Viewer Extension and Reauthorization Act of 2004*, 20 F.C.C.R. 17278, 17302 (Nov. 2, 2005). In its address of the leasing arrangement, the FCC gave no indication that the lessor entity qualifies as a satellite carrier, only that the lessee carrier so qualifies. *Id*. at 17302-03.

The Networks claim that allowing EchoStar to function as a passive lessor and obtain rent payments circumvents the severe penalty of § 119(a)(7)(B)(i). We

are unpersuaded. It is undisputed that EchoStar has lost all revenue previously earned through distant network programming at a cost of $25 million per year. Likewise, there is no contention of foul play relating to the rent payments, i.e., no one contends that NPS' rent payment of $150,000 per month fails to represent the fair market value of leasing a transponder. EchoStar no longer has any control over the pricing, billing, or collection of payments for distant network programming, and does not receive, or share in, any revenues or profits received by NPS's provision of distant network programming. Put simply, EchoStar is out of the distant network programming business. Section 119(a)(7)(B)(i) does not bar the leasing out of a transponder, and we will not prohibit the Lease Agreement absent a clear indication from Congress to do so.

We conclude, therefore, that EchoStar, as a passive lessor of its satellite equipment, does not qualify as a satellite carrier with respect to NPS's retransmissions of distant network programming. Because § 119(a)(7)(B)(i) only reaches EchoStar as a satellite carrier engaged in retransmitting distant network programming, EchoStar is not in violation of the injunction.[13]

---

[13]EchoStar contends that the "passive carrier exemption" of § 111(a)(3) applies to EchoStar in its current role as a passive lessor and therefore exempts EchoStar from violating the § 119(a)(7)(B)(i) injunction. Whether EchoStar qualifies for the § 111(a)(3) exemption is irrelevant, however, because that provision only exempts carriers from copyright infringement liability, *see* § 111(a), and has no bearing on whether EchoStar is in violation of the permanent, nationwide injunction pursuant to § 119(a)(7)(B)(i).

## C. Whether the Agreement Violates the SHVERA

In addition, the Networks argue that the Lease Agreement violates the "if local, no distant" provision of the Satellite Home Viewer Extension and Reauthorization Act of 2004, Pub. L. No. 108-447, tit. IX, 118 Stat. 3393 ("SHVERA"). The Networks cite to the following provisions:

> (C) Future applicability
> A satellite carrier may not provide a distant analog signal (within the meaning of subparagraph (A) or (B)) to a person who--
> . . .
> (ii) at the time such person seeks to subscribe to receive such secondary transmission, resides in a local market where the satellite carrier makes available to that person the analog signal of a local network station affiliated with the same television network pursuant to section 338 of this title, and the retransmission of such signal by such carrier can reach such subscriber.
> (D) Special rules for distant digital signals
> . . . .
> (iv) Local-to-local digital markets
> After the date on which a satellite carrier makes available the digital signal of a local network station, the carrier may not offer the distant digital signal of a network station affiliated with the same television network to any new subscriber to such distant digital signal after such date, except that such distant digital signal may be provided to a new subscriber who cannot be reached by the satellite transmission of the local digital signal.

47 U.S.C. § 339(a)(2)(C)(ii), D(iv).

The Networks argue that the above provisions "bar[] a satellite carrier from retransmitting the signals of a *distant* network affiliate to new customers in a geographic market in which the same satellite carrier is also retransmitting the

20

signals of a local affiliate of the same network, even if those customers are in areas 'unserved by conventional terrestrial broadcasts.'" (Appellants' Initial Brief at 37-38.) Under the Networks' own reading of SHVERA, the local and distant signals must derive from the *same* satellite carrier. While EchoStar continues to run its own business by retransmitting local network programming as a satellite carrier, EchoStar no longer retransmits distant network programming as a satellite carrier. Under the Lease Agreement, NPS is the sole satellite carrier retransmitting distant network programming. Since EchoStar is not a satellite carrier retransmitting both distant and local network programming, EchoStar is not in violation of the SHVERA.

## IV. CONCLUSION

For the foregoing reasons, we conclude that EchoStar is not prohibited under § 119(a)(7)(B)(i) from leasing its transponder to NPS under the Lease Agreement. Accordingly, we affirm.[14]

**AFFIRMED.**

---

[14] Because we affirm the district court's denial of the Networks' motion to modify the injunction, we need not reach the merits of NPS's cross-appeal relating to the district court's denial of NPS's motion to intervene.