[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-12874

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
October 21, 2008
THOMAS K. KAHN
CLERK

D. C. Docket No. 04-00026-CV-4-MMP-AK

ANDREW NGUYEN, MD, an individual,
ANDREW NGUYEN, MD PA, A Florida
Professional Association,

Plaintiffs-Appellants,

versus

UNITED STATES OF AMERICA,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

**(October 21, 2008)**

Before CARNES and MARCUS, Circuit Judges, and BUCKLEW,[*] District Judge.

CARNES, Circuit Judge:

_____

[*]Honorable Susan C. Bucklew, United States District Judge for the Middle District of Florida, sitting by designation.

This appeal brings us the question of whether the waiver of sovereign immunity in the Federal Tort Claims Act, 28 U.S.C. § 1346(b), extends to claims of false arrest, false imprisonment, and malicious prosecution arising from the acts or omissions of federal investigative or law enforcement officers, see id. § 2680(h). The facts of this case show why Congress has chosen to waive the sovereign immunity of the United States in some circumstances, and the plaintiff's story illustrates the value of living in a country where a citizen may pursue claims against the government in those circumstances.

## I.

Andrew Nguyen overcame a lot of obstacles on his way to becoming a citizen of the United States of America entitled to the full protection of its laws. He was born in Hanoi in 1938. When the communists took control of North Vietnam, he moved south at age sixteen. At age twenty-five, Nguyen completed a pre-medical education program at a college in Saigon. Later he earned a medical degree from a school in Saigon that was accredited by the American Medical Association. During the Vietnam War, Dr. Nguyen served as a combat physician in the South Vietnamese army for three years, eventually earning the rank of captain. He was injured in combat.

After the Communists took over South Vietnam, Dr. Nguyen was arrested at the temporary hospital where he worked.  Falsely accused of being a spy left behind by the CIA, he was imprisoned for a year.  In prison he was forced to do hard labor that injured his back.  When Dr. Nguyen was finally released from prison, he went to work at a private, 600-bed Chinese hospital in Saigon, serving as chief of the emergency room for two years and then as chief of internal medicine for another two years.

Dr. Nguyen attempted to escape from Vietnam more than once.  In 1978 after his first escape attempt failed, the forty-year-old Dr. Nguyen was put in jail again, this time for nine months.  After he got out, Dr. Nguyen began planning another escape, one that eventually included eighty-one people desperate to flee communist rule.  Through a perilous, four-day sea voyage in an old boat burning gasoline that had been bought one gallon at a time on the black market, the group managed to escape to the seashore of Thailand.  They spent months in a refugee camp there.

With the help of some relatives in this country, Dr. Nguyen then made his way to America.  He was required to pass three examinations in order to get his medical license.  In the meantime he worked at a newspaper as a translator and

also served at a VA hospital as a volunteer physician. He ultimately obtained two state medical licenses, one from Florida and the other from Massachusetts.

A friend of his put Dr. Nguyen in contact with a physician in Trenton, Florida who was selling his medical practice. When Dr. Nguyen bought the practice in 1984, he was the only licensed medical doctor in Trenton, which had a population of less than 1,500. See United States Bureau of the Census, United States Census of Population: 1990 General Population Characteristics, Florida 1-11-9, Table 1; Id. 1980 Number of Inhabitants, Florida 1-11-22, Table 5. He eventually received hospital privileges at Shands Teaching Hospital and at North Florida Medical Center, both of which are located in a neighboring county.

The year 1986 was an important one for Dr. Nguyen. He became a citizen of the United States of America.

On March 23, 2000, Dr. Nguyen was sixty-two years old and had been practicing medicine in Trenton for sixteen years. The day started out like any other for him. He was in his office treating patients. A deputy from the Gilchrist County Sheriff's Office came into Dr. Nguyen's office and arrested him without warning or explanation. The deputy was accompanied by Robert Yakubec, an agent of the Drug Enforcement Agency, who removed from the wall a certificate that authorized Dr. Nguyen to prescribe controlled substances for his patients.

The officers did not give the doctor a chance to explain whatever they thought he had done wrong. They told him that he had no choice but to go to jail. Dr. Nguyen informed his wife, who worked at the front desk, that he was being carried to jail. He got into the back of the police car and was taken there.

The two officers who photographed and fingerprinted Dr. Nguyen at the jail were patients of his. They took all of his personal belongings and issued him an inmate uniform. He was held in jail for about five hours. When he was released at the end of the day, Dr. Nguyen still did not know why he had been arrested.

Dr. Nguyen later learned that he had been arrested for six counts of delivery of a controlled substance in violation of Fla. Stat. § 893.13(1)(a), which makes it a crime to deliver a controlled substance "[e]xcept as authorized by this chapter." That chapter of the Florida Code authorizes medical doctors to dispense or prescribe controlled substances "in good faith and in the course of his or her professional practice only." Fla. Stat. § 893.05(1). The crime alleged in a six-count arrest warrant was that Dr. Nguyen had delivered Lortab and Valium, which contain the controlled substances hydrocodone and diazepam, "to a confidential source by use of a written order for said drug[s] not issued in good faith and in the course of his professional practice, contrary to section 893.13(1)(a)(2)." The not in good faith and not in medical practice elements were more specifically

described in the affidavit underlying the warrant. It accused Dr. Nguyen of issuing prescriptions for those two controlled substances to a confidential informant "without any type of physical examination or medical need." From the warrant and affidavit it is clear that if the drugs were prescribed after physical examinations and in the course of Dr. Nguyen's medical practice, there was no crime. The parties agree about that.

Dr. Nguyen returned to work the day after his arrest hoping to practice medicine as he had done before, but he couldn't. A pharmacy informed him that he could no longer prescribe anything—not even cough syrup. His arrest was headline news in the local media. Patients began calling to ask if he was a criminal.

The charges against Dr. Nguyen were nol prossed on May 17, 2000, 55 days after the arrest, because of "insufficient evidence as to this defendant." That action did not undo the harmful domino effect the arrest had on his medical practice. Health insurance companies, whose payments had been fifty to sixty percent of his professional income, cancelled their contracts with him. That caused him to lose patients who paid with health insurance. The loss of those patients caused a financial strain on his practice, making it difficult for him to retain employees and to purchase equipment and supplies. As a result, he had to

let one of his three employees go. Even after Dr. Nguyen got his prescription privileges back several months later, no health insurance provider would agree to contract with him again.

What happened to Dr. Nguyen's practice is what happens to the established professional practices of medical doctors who are caught committing crimes involving controlled substances. If the record before us is to be believed, however, Dr. Nguyen committed no crime. It is not just that the charges against him were dismissed on insufficient evidence grounds. It is more than that. The record, as it now exists, indicates that Dr. Nguyen's arrest was not based on any evidence of wrongdoing at all. All of the evidence that law enforcement officers had then, as well as now, showed that he was guilty of no crime.[1] They arrested him anyway.

Dr. Nguyen's arrest grew out of a three-month investigation led by DEA Agent Robert Yakubec, who was the head of a controlled substances task force

---

[1] We emphasize that our statements are based on the record before us and the record as it now exists. The United States was dismissed on sovereign immunity grounds before trial, and for that reason we take the allegations of the complaint as true. Dr. Nguyen's claims against the sheriff and deputy sheriff, whom he also named as defendants, went to trial, and the jury found the two of them liable on various claims. Although this appeal involves only the defendant United States, we have drawn some of the facts from the trial. Those facts are entirely consistent with the amended complaint and provide background information for present purposes. On remand, however, the actual facts will have to be developed or re-developed in summary judgment proceedings or at a trial in which the United States has an opportunity to defend its interests on grounds other than sovereign immunity.

targeting several physicians in the area. Three times during the investigation Dr. Nguyen prescribed Lortab and Valium, which contain controlled substances, to a patient who was also a confidential informant for the task force. On each of those occasions Dr. Nguyen or a member of his staff had first conducted a physical examination of the informant patient. All of the evidence the task force obtained during the investigation showed that those examinations had been performed each time. The task force even had tape recordings of that informant patient's office visits with Dr. Nguyen proving that a physical examination was conducted on each of the three visits. After every visit the task force had the informant patient sign an affidavit describing what had happened while she was in Dr. Nguyen's office, and in those affidavits she described the physical examinations that had been conducted before she got the prescriptions. Records in Dr. Nguyen's office not only showed that the patient had been examined but also that she was there with complaints about "nervousness," "insomnia," and "pain," which she told the doctor she had been experiencing for "months." Those records, which were consistent with the covert tapes and the informant patient's affidavits, indicated that the drugs were prescribed by Dr. Nguyen in good faith during the course of his medical practice, but none of the officers asked for those records before charging him with a crime.

8

Deputy Carlisle of the Gilchrist County Sheriff's Office was the actual arresting officer. He died before trial but had given a deposition which was read into evidence. In that deposition Carlisle described how the DEA had targeted several physicians in the area for dispensing controlled substances without giving patients a physical examination. It was all a DEA operation and the Sheriff's Office was "just there to assist them." Robert Yakubec was the DEA agent in charge.

Deputy Carlisle was told by the DEA agents that a confidential informant had gone to Dr. Nguyen's office and had gotten a prescription without being given a physical examination. Carlisle was the one who wrote out the affidavit used to secure a warrant to arrest Dr. Nguyen. Carlisle testified, however, that he had never spoken with the confidential informant about whether she had received a physical examination. He also conceded that he did not know what physical conditions justified a prescription for Lortab or Valium.

Deputy Carlisle did not receive any evidence from the investigation until after Dr. Nguyen had been arrested. His only information about the case and the alleged absence of a physical examination of the confidential informant came from the DEA. He explained that the DEA "took control of all the evidence. They had it all. All we were there for is to work with them because it was in our

9

jurisdiction." Specifically, he noted that the DEA took control of all the recordings and the taped statements.

When asked why a physician or pharmacist was not consulted before he signed the arrest affidavit, Deputy Carlisle responded that the "DEA, Mr. Bob [Yakubec] and them was running the show and they were doing it the way they seen fit." He testified that if he had known that a physical examination had been conducted, he never would have included a statement to the contrary in the arrest affidavit. When asked whether he made "any attempt to confirm that statement independently" or whether he relied "totally on the statements of Agent Yakubec," he replied: "Totally on DEA." According to Carlisle, Yakubec sat in the room while Carlisle typed up the arrest affidavit. He showed it to Yakubec, among others in the room, and all agreed that what it described—controlled substances being distributed without a physical examination—was what had taken place. The problem is that was not true. There had been a physical examination each time before medication was prescribed. The affidavit and arrest warrant were based on a false statement.

## II.

When he was wrongly jailed by the government of Vietnam and its agents, Dr. Nguyen had no remedy but to flee from the country. As an American citizen,

10

though, he has a better remedy for that kind of abuse of governmental power. He sued. By the time a third amended complaint had been filed in the district court, Dr. Nguyen, his medical practice, which was suing as a professional association, and his wife (suing solely as a co-owner of the professional association) were asserting a number of claims against Deputy Carlisle, the Sheriff of Gilchrist County, and the United States as the employer of DEA Agent Yakubec. After the district court granted the United States' motion to dismiss it on sovereign immunity grounds, the claims against the Sheriff and (the estate of) Deputy Carlisle went to trial. A jury found for Dr. Nguyen and his medical practice on their malicious prosecution and false arrest claims against Deputy Carlisle and the Sheriff, and it also found for them against Deputy Carlisle on their Fourth Amendment claim (called a "civil rights claim" in the jury instructions and verdict form). The jury assessed damages in the total amount of $1,836,100. After the district court entered judgment against the deputy and sheriff in that amount, they appealed. While their appeal was pending, they and Dr. Nguyen settled.

All that remains of the lawsuit at this point is the appeal by Dr. Nguyen and his medical practice from the district court's dismissal of their claims against the United States as Agent Yakubec's employer. Those claims are for false arrest, false imprisonment, and malicious prosecution. The district court dismissed the

11

claims against the United States for lack of jurisdiction solely on sovereign immunity grounds.  The validity of that dismissal turns on whether the United States waived its sovereign immunity in the Federal Tort Claims Act.

**III.**

Section 1346 of the FTCA provides that:

> [T]he district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).  That paragraph is a waiver of sovereign immunity, but part of that waiver is taken back in the "Exceptions" section of the FTCA, which provides, among other things, that the waiver in § 1346(b) "shall not apply to":

> (a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).  The discretionary function clause in that paragraph covers decisions about whether and when to make an arrest.  And that is so, the last eight

12

words of that paragraph make clear, even where the officer or agent abused the discretion he exercised.

Our qualified immunity decisions about discretionary function are instructive. The first question in determining whether qualified immunity protects a government official or officer from suit is whether his allegedly wrongful action was "within the scope of his discretionary authority." Hartsfield v. Lemacks, 50 F.3d 950, 953 (11th Cir. 1995). As we have explained, "the question of whether the defendants acted lawfully [is distinct from] the question of whether they acted within the scope of their discretion." Sims v. Metro. Dade County, 972 F.2d 1230, 1236 (11th Cir. 1992). To frame the inquiry as one question would reduce the question of discretion to an "untenable tautology." See Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1282 (11th Cir. 1998) (explaining that the "inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act . . . . Instead, a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties."); Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265-66 (11th Cir. 2004) (In making this determination "instead of focusing on whether the acts in question involved the exercise of actual discretion, we assess whether they are of a type that fell within the employee's job

13

responsibilities . . . . [W]e look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances.").

"[I]n assessing whether a police officer may assert qualified immunity against a Fourth Amendment claim, we do not ask whether he has the right to engage in unconstitutional searches and seizures, but whether engaging in searches and seizures in general is a part of his job-related powers and responsibilities." Holloman, 370 F.3d at 1266 (emphasis omitted). The same reasoning holds true in the sovereign immunity context. Here, Yakubec's investigation and arrest of Nguyen were part of his job-related powers and responsibilities. That means it was a discretionary function. Cf. Mesa v. United States, 123 F.3d 1435, 1438 (11th Cir. 1997) ("The decision as to how to locate and identify the subject of an arrest warrant prior to service of the warrant is susceptible to policy analysis."); see also Mid South Holding Co., Inc. v. United States, 225 F.3d 1201, 1206 (11th Cir. 2000) (holding that "the on-site decisions" of Customs and Coast Guard officials "concerning the manner in which to search the vessel also fall within the scope of the discretionary function exception").

Because decisions about whether and when to make an arrest are within the scope of an officer's discretionary functions, they are covered by the general exception to the waiver of sovereign immunity that is contained in § 2680(a). But they are more specifically covered by paragraph (h) of that same section, which provides:

> (h) Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights: Provided, That, with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and section 1346(b) of this title shall apply to any claim arising, on or after the date of the enactment of this proviso, out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution. For the purpose of this subsection, "investigative or law enforcement officer" means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.

28 U.S.C. § 2680(h). The first clause of that paragraph—the language down to the proviso—reinforces what paragraph (a) provides but in the specific context of the listed claims, which include "false imprisonment, false arrest, [and] malicious prosecution." Id. Without that proviso Dr. Nguyen's claims against the United States would be barred by paragraph (a) because they are based on Agent Yakubec's "exercise or perform[ance of] a discretionary function or duty . . .

15

whether or not the discretion involved [was] abused," and the claims also would be barred by paragraph (h) because they are listed there.

There is, however, the proviso in § 2680(h), which changes everything. It was enacted on March 16, 1974. See Pub. L. No. 93-253, § 2, 88 Stat. 50 (1974). The proviso plainly states that with regard to acts occurring after it was enacted § 1346(b) shall apply. Section 1346(b) is the general waiver of sovereign immunity and § 2680(a) and (h) are exceptions to that waiver. The proviso in § 2680(h) takes the claims it specifies out of the exceptions and makes the general waiver applicable to them. It is an exception to the exceptions to the waiver of sovereign immunity. The net result is that the United States has waived its sovereign immunity for the claims listed in the § 2680(h) proviso. Those claims include "false imprisonment, false arrest, . . . [and] malicious prosecution." That means a lawsuit against the United States is permitted insofar as it asserts those claims.

Our construction of § 2680(a) and (h) and the proviso is in keeping with applicable canons of statutory construction. To the extent of any overlap the more specific provision trumps the general one. See ConArt, Inc. v. Hullmuth, Obata + Kassabaum, Inc., 504 F.3d 1208, 1210 (11th Cir. 2007); Bouchard Transp. Co., Inc. v. Updegraff, 147 F.3d 1344, 1351 (11th Cir. 1998).

16

To the extent of any conflict the later appearing provision in a statute governs. See ConArt, 504 F.3d at 1210; Tug Allie-B, Inc. v. United States, 273 F.3d 936, 948 (11th Cir. 2001); Southern Natural Gas Co. v. Land, Cullman County, 197 F.3d 1368, 1373 (11th Cir. 1999). In determining the plain meaning of a statutory provision we consider the words in context and the language and design of the statute as a whole. Tyler v. Cain, 533 U.S. 656, 662, 121 S. Ct. 2478, 2482 (2001); CBS Broad. Inc. v. EchoStar Commc'ns Corp., 532 F.3d 1294, 1301 (11th Cir. 2008); Wachovia Bank, N.A. v. United States, 455 F.3d 1261, 1267–68 (11th Cir. 2006). And, of course, the plain meaning of a statutory provision is the law. CBS, 532 F.3d at 1300-01; United States v. Mount Sinai Med. Ctr. of Florida, 486 F.3d 1248, 1252 (2007) (citing Hartford Underwriters Ins. Co v. Union Planters Bank, 530 U.S. 1, 6, 120 S. Ct. 1942, 1947 (2000)); Wright v. Sec'y for Dep't of Corr., 278 F.3d 1245, 1255 (11th Cir. 2002).

Although by no means necessary to our conclusion, the purpose of the 1974 amendment adding the proviso to § 2680(h) is worth noting. See generally Harris v. Garner, 216 F.3d 970, 977 (11th Cir. 2000) ("Notwithstanding that well-recognized and bedrock principle [that there is no need to consult legislative history when the meaning of a statute is plain from its words], sometimes judges who find that legislative history supports and complements the plain meaning of

17

statutory language cannot resist the temptation to set out that history. We have given in to that temptation more than once."). Congress enacted the proviso amending § 2680(h) in response to two highly-publicized raids by federal narcotics agents on the homes of two innocent families in Collinsville, Illinois. See S. Rep. No. 93-588 (1974), reprinted in 1974 U.S.S.C.A.N. 2789, 2790. Both raids were conducted without warrants, both were based on mistaken information, and they occurred on the same night in the same town.[2] Id.

In the first of the Collinsville raids the federal agents smashed in the door of the Giglotto family's home, brandished pistols, threw Mr. Giglotto down and handcuffed him, interrogated him at gunpoint, pointed a pistol at Mrs. Giglotto as she pleaded for her husband's life, and ransacked the house. See 119 Cong. Rec. 23246 (1973). Only later did the agents realize that they were at the wrong address and leave. Id. In their wake, they left a smashed television, a broken camera, scattered books and clothes, scratched furniture, a shattered antique dragon, and two distraught people. Id.; see also id. at 14084.

---

[2] These raids were widely reported by news media. See e.g., Andrew H. Malcolm, Drug Raids Terrorize 2 Families–by Mistake, N.Y. Times, Apr. 29, 1973, at 1, 43; Law Enforcement: The Collinsville Reich, Newsweek, May 14, 1973, at 45; In the Name of the Law, Time, May 14, 1973, at 38. In discussing the need for an amendment to FTCA § 2680(h), several senators introduced into the Congressional Record news accounts of the raids. In the next two paragraphs of the text of this opinion we draw facts from those news accounts to show Congress' understanding about what had happened during the raids.

Later that evening federal narcotics agents led twenty-five members of the same strike force to the home of the Askew family who lived nearby. Id. at 14085. An agent forced his way in as Mr. Askew tried to close the door. Id. His wife fainted. Id. The officers searched the home and interrogated Mr. Askew at gunpoint. Id. at 14085, 23243. After the officers realized that they were at the wrong house, they left. Id. at 14085, 23243.

Under § 2680(h) of the FTCA, as it was then written, sovereign immunity barred the innocent victims of the Collinsville raids from recovering damages from the government. S. Rep. No. 93-588, at 2790. ("There is no effective legal remedy against the Federal Government for the actual physical damage, much less the pain, suffering and humiliation to which the Collinsville families have been subjected.") Congress added the proviso to § 2680(h) to ensure that future victims of these kinds of torts inflicted by a federal law enforcement officer or agent would have a damages remedy. Our construction of § 2680(h) and its proviso furthers that purpose. See Sutton v. United States, 819 F.2d 1289, 1298 (5th Cir. 1987) (referring to Collinsville and Congress' intent to provide an effective legal remedy).

## V.

Our interpretation of § 2680(h) does not run afoul of any prior precedent.

The decision in Siebert v. Baptist, 594 F.2d 423 (5th Cir. 1979),[3] does not

establish any law about how to interpret § 2680(h) and its proviso. For one thing,

the claims in that case arose in 1972, id. at 425–27, while the proviso applies only

to claims arising out of conduct that occurs after March 16, 1974. See 28 U.S.C. §

2680(h). That is probably why the opinion in Siebert does not mention the proviso

to § 2680(h). For another thing, the case involved § 2680(c), not (h).

Our decision in Brown v. United States, 653 F.2d 196 (5th Cir. Unit A Aug.

1981),[4] reaches the same conclusion about § 2680(h) that we do here, albeit

without as much analysis. It came in an appeal from the district court's dismissal

of a malicious prosecution claim against an FBI agent. Id. at 197. The district

court dismissed the claim on the merits because it found that the FBI agent had

acted without malice, as defined by Texas law. Id. at 201. Before addressing the

merits on appeal our predecessor court was required to and did determine whether

---

[3] In our en banc decision Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[4] The preexisting Fifth Circuit precedent that the Bonner decision adopted as binding precedent in this circuit includes all Unit A panel decisions issued before October 1, 1981. United States v. Todd, 108 F.3d 1329, 1333 n.5 (11th Cir. 1997).

sovereign immunity barred the lawsuit, because if it did the court of appeals as well as the district court would have been without jurisdiction to consider the merits.

The Brown Court recognized that Congress had partially waived the United States' sovereign immunity for certain tort claims in the FTCA and that in 1974 it had amended the FTCA with the proviso to § 2680(h) in order to permit claims arising from certain willful torts, including assault, battery, false imprisonment, false arrest, abuse of process, and malicious prosecution when they were committed by federal investigative or law enforcement officers. Id. at 198–99. The Court held that a claim would lie under the FTCA against the United States for malicious prosecution under § 2680(h)'s proviso, id. at 199, although it also agreed with the district court that the claim should be dismissed on the merits because of the lack of malice. Id. at 199, 201.

The conclusion in Brown that § 2680(h) waives sovereign immunity for malicious prosecution claims is a holding. It was necessary to the decision. See Bennett v. United States, 102 F.3d 486, 488 n.1 (11th Cir. 1996) ("Unless the United States may be held liable pursuant to the terms of the statute, the sovereign's immunity remains intact, and no subject matter jurisdiction exists.") (citation omitted); Cadet v. Bulger, 377 F.3d 1173, 1179 (11th Cir. 2004)

21

("Federal courts are obligated to inquire into subject-matter jurisdiction sua sponte whenever it may be lacking." (quotation omitted)). As an explicit jurisdictional holding, Brown's interpretation of § 2680(h) is binding precedent. See Main Drug, Inc. v. Aetna U.S. Healthcare, Inc., 475 F.3d 1228, 1231 (11th Cir. 2007) ("If jurisdictional holdings are explicit they must be followed, not so if they are only implicit."). While we agree with that decision, we would have to follow it even if we did not. See United States v. Steele, 147 F.3d 1316, 1317–18 (11th Cir. 1998) (en banc); Cohen v. Office Depot, Inc., 204 F.3d 1069, 1076 (11th Cir. 2000); Wascura v. Carver, 169 F.3d 683, 687 (11th Cir. 1999).

To the extent that Adras v. Nelson, 917 F.2d 1552 (11th Cir. 1990) or Mesa v. United States, 123 F.3d 1435 (11th Cir. 1997) are to the contrary, those decisions conflict with the earlier precedent of the Brown decision. And because the prior precedent rule requires us to follow the earlier of two inconsistent precedents, we are bound by Brown. See Hurth v. Mitchem, 400 F.3d 857, 862 (11th Cir. 2005) ("While we are not permitted to reach a result contrary to a prior panel's decision merely because we are convinced it is wrong . . . we must reach a contrary result where the prior panel decision is itself inconsistent with earlier ones. This is but another way of saying that where two or more decisions of this Court are inconsistent, we follow the earliest one.").

22

For these reasons, we conclude that the proviso to § 2680(h) means what it says, means what canons of statutory interpretation indicate it does, and means what the <u>Brown</u> decision holds. In the FTCA Congress has waived sovereign immunity as to specified claims, including false imprisonment, false arrest, and malicious prosecution arising out of acts or omissions, including discretionary function ones, of federal investigative or law enforcement officers. The district court should not have granted the United States' motion to dismiss on sovereign immunity grounds.

**REVERSED.**